537 F.2d 1347
 193 U.S.P.Q. 264, 1976-2 Trade Cases 61,047
 YODER BROTHERS, INC., Plaintiff-Appellant-Cross Appellee,
v.
CALIFORNIA-FLORIDA PLANT CORPORATION et al.,
Defendants-Appellees-CrossAppellants.
CALIFORNIA-FLORIDA PLANT CORPORATION et al.,
Plaintiffs-Appellees-CrossAppellants,
v.
YODER BROTHERS, INC., Defendant-Appellant-Cross Appellee.
 No. 75-2141.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 7, 1976.
 
 Charles M. Ullman, David L. Foster, Frederick L. McKnight, New York City, for plaintiff-appellant-cross appellee.
 Frederick P. Furth, Arthur L. Martin, San Francisco, Cal., John H. Boone, San Francisco, Cal., Thomas E. Schatzel, Santa Clara, Cal., for defendants-appellees-cross appellants.
 Appeals from the United States District Court for the Southern District of Florida.
 Before BROWN, Chief Judge, and JONES and GOLDBERG, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 In this clash between two giants of the chrysanthemum business, we confront a myriad of antitrust and plant patent issues. Yoder Brothers (Yoder), plaintiff in the district court, sued, alleging infringement of twenty-one chrysanthemum plant patents by California-Florida Plant Corp. (CFPC) and California-Florida Plant Corp. of Florida (CFPCF) (sometimes referred to collectively as Cal-Florida). CFPC and CFPCF denied the infringement and filed antitrust counterclaims under sections 1 and 2 of the Sherman Act. As to seven of the chrysanthemum plant patents, the lower court directed verdicts for Yoder that the patents were valid and infringed and awarded treble damages. The court also ruled for Yoder on Cal-Florida's section 2 claim. CFPC and CFPCF, however, prevailed in their antitrust counterclaim under section 1 and received treble damages for Yoder's derelictions.
 
 
 2
 Because many of the issues in this case turn on the particular nature of the ornamental plant industry and the specific characteristics of chrysanthemums, we shall describe the background facts in some detail before discussing the many complex legal issues presented on this appeal. Following our description of the facts, we shall briefly sketch the procedural history of the case. Finally, we shall consider the antitrust claims and the issues relating to the plant patent law.
 
 I. General Background
 A. The Chrysanthemum Industry
 
 3
 Chrysanthemums, in their natural state, blossom only during the fall. This is because they are photoperiodic in nature, meaning that their growth is affected by the relative lengths of lightness and darkness in the day. When the days are long, the chrysanthemum plant remains in a vegetative state. As the nights become longer, the initiation process of the chrysanthemum bud begins. Thus, in early August, when the nights achieve a duration of nine and one-half continuous dark hours, the chrysanthemum plant in its natural state will begin the process of developing a flower. During the fall and early winter months, the mature flower appears.
 
 
 4
 Yoder began doing business in the 1930's as a simple greenhouse operator, specializing in tomatoes. Soon thereafter, because the fall tomato crop was less profitable than the spring crop, it decided to replace the fall crop with chrysanthemums. In 1939 or 1940, Yoder employees began research into out-of-season flowering of chrysanthemums. By applying black cloth shades over the chrysanthemums when dark hours were needed and applying artificial light when light hours were needed, it became possible to flower chrysanthemums on a year-round basis. Yet this breakthrough was not without its problems. For example, the use of black cloth shades resulted in an abnormally high temperature build-up around the plants, which in turn retarded bud initiation. Similarly, when the finishing temperatures were too warm, the chrysanthemums would not hold their color. In an effort to adjust for these conditions and to improve the quality of the chrysanthemum generally, Yoder initiated a breeding program in the early 1940's. One of the most important goals of the breeding program was the development of new varieties for consumers.
 
 
 5
 Although the ornamental plant industry encompasses many different kinds of flowers, including azaleas, carnations, roses, african violets, geraniums, snapdragons, and others, chrysanthemums are one of the most popular of the genre. According to the United States Department of Agriculture, in 1971 approximately 2,134 growers in twenty-three states sold nearly 145 million blooms from about 129 million standard variety chrysanthemum plants, 34.5 million blooms from 136 million pompon chrysanthemum plants, and 17.5 million potted chrysanthemum plants. At the time of the trial there were over 475 different varieties of chrysanthemums available. The total wholesale value of growers' sales in the twenty-three states that year was approximately 83.5 million dollars.
 
 
 6
 Chrysanthemums have been subject to intensive breeding efforts over the past thirty years; each individual specimen is a genetically unique complex organism. Several definitions of the term "variety" of chrysanthemum were offered at trial. Mr. Duffett, Yoder's head breeder, defined a variety as a group of individual plants which, on the basis of observation by skilled floriculturists and according to reasonable commercial tolerances, display identical characteristics under similar environments. Cal-Florida defined variety in its complaint as "a subspecies or class of chrysanthemums distinguishable from other subspecies or classes of chrysanthemums by distinct characteristics, such as color hue, shape and size of petal or blossom or any of them."
 
 
 7
 New varieties of chrysanthemums are developed in two major ways: by sexual reproduction and by mutagenic techniques. Sexual reproduction, the result of self or cross pollination, produces a genetically unique seedling, the characteristics of which are impossible to predict. Mutagenic techniques simply accelerate the natural rate of mutation in the chrysanthemum plant itself. A mutation was defined by Mr. Duffett as "a change in the number of chromosomes or a change in the chromosome position or a specific change in the genes within those chromosomes." Technically, only those mutations that first express themselves as bud variations are properly called "sports"; however, the word is used loosely in the industry as a general synonym for mutation, and we will so use it. Two types of sports can appear: spontaneous sports and radiation sports. The cells of all living things occasionally mutate, and spontaneous sports are simply the result of that process. Radiation sports, on the other hand, are induced artificially, through exposure to such things as gamma radiation from radioactive cobalt and X-rays. These techniques do nothing that could not occur in nature apart from speeding up the natural mutation process. Although most of the mutations induced by radiation are not commercially usable plants, a skilled breeder will select for further development those that display such desirable characteristics as fast response time, temperature tolerance, durability, size, and vigor.
 
 
 8
 After a breeder has successfully isolated a new variety, the only way he can preserve his creation is by means of asexual reproduction. In the case of chrysanthemums, the most common technique of asexual reproduction is the taking of cuttings from a stock plant. Cuttings, as defined in the Cal-Florida complaint, are "sections or parts of chrysanthemum plants which may be grown into mature plants for sale as cut flowers and/or potted plants or from which additional cuttings may be harvested." According to Yoder's suggested definition, cuttings are simply immature chrysanthemum plants. Since a cutting is genetically identical to the parent plant, it will develop into a plant whose characteristics match the parent's exactly, so long as the same environmental conditions obtain. A central fact of life in the chrysanthemum industry is the ease with which cuttings can be taken from parent plants: from one chrysanthemum, it is theoretically possible to develop an infinitely large stock, by taking cuttings, maturing some into flowered plants, taking more cuttings, and so on.
 
 
 9
 Over the years since Yoder first entered the chrysanthemum business, the industry has become internally specialized. At the first functional level are the breeders, who create new varieties of chrysanthemums. Breeding is an expensive, complex procedure. The breeder must possess the skill and discrimination to spot potential new varieties and recognize whether they possess desirable traits; facilities for elaborate testing and development must be available. Because chrysanthemums mutate rapidly, a breeder must always be on the lookout for new changes.
 
 
 10
 At the next level in the industry are the propagator-distributors. The propagator-distributors build up mother stock from sources such as breeders, retail florists, or their existing flowers, and reproduce cuttings from that mother stock. In a sense they are simply mass producers of cuttings. They do not develop cuttings to the mature flower stage (except for purposes of their own testing). Next are the growers, who develop cuttings purchased from propagator-distributors into mature plants either for cut flowers or potted plants. Combining the function of propagator-distributors and growers are the self-propagators. Cal-Florida defined a "self-propagator" as "a person who either buys or establishes stock and takes cuttings for the sole purpose of producing cut flowers and/or potted plants for resale or own use." In other words, the self-propagators are vertically integrated into one step. Finally, the growers (or self-propagators) sell their products to retail florists, who in turn sell to ultimate consumers.
 
 B. The Parties
 
 11
 During the times relevant to this litigation, Yoder operated on two levels in the business: as a substantial (if not the largest) breeder of new varieties of chrysanthemums, and as a large propagator-distributor. In addition to chrysanthemums, Yoder dealt with carnation cuttings, azalea liners (baby azaleas), and snapdragon seeds. Yoder is an Ohio corporation, and it sells its products nationwide.
 
 
 12
 CFPC, which is incorporated in California, and which sells primarily in the western part of the United States, was a propagator-distributor. CFPCF, a wholly owned subsidiary of CFPC, was also a propagator-distributor. CFPCF is incorporated in Florida and it sells in the eastern United States. Both CFPC and CFPCF specialize in chrysanthemums. They entered the marked in 1957, at a time when Yoder was clearly the largest of the propagator-distributors. During the period in question, Yoder and the two Cal-Florida companies competed horizontally as propagator-distributors they did not compete as breeders, although Cal-Florida did make a minor foray into breeding during the 1960's.C. The Plant Protection Programs
 
 
 13
 The issues in this litigation arose out of Yoder's breeding operations and its desire to secure a fair return from those efforts. Theoretically, once the first plant of a new variety is sold, it is impossible for a breeder ever again to be compensated for his efforts in developing it. As indicated above, anyone can take a cutting from that new plant, propagate a number of cuttings from the first cutting, and obtain an infinite supply of the plant. Even as a practical matter, the evidence at the trial suggested that it was relatively easy to obtain plant material of new varieties without the consent of the breeder.
 
 
 14
 Yoder's first effort to obtain compensation for its breeders took the form of a program entitled the Yoder Grower Agreement, or YGA, instituted around 1958. In return for access to new varieties developed by Yoder, growers were required to sign an agreement that prohibited purchasers of Yoder cuttings from selling, loaning, or otherwise disposing of purchased cuttings. Specifically, growers were prohibited from selling Yoder cuttings to self-propagators or to propagator-distributors. The agreement also contained a "sport return clause," which required purchasers of Yoder cuttings to return to Yoder any mutations which appeared either directly or indirectly on Yoder cuttings. Yoder enforced the YGA program by refusing to ship covered varieties to persons who did not sign a YGA agreement. The most significant aspect of the YGA program was the fact that a royalty was charged on all Yoder cuttings propagated or used.
 
 
 15
 In the early 1960's, the YGA program was replaced by a new system that took its name from the Breeder-Grower Agreement that was its central reason for being. A corporation called BGA, International (BGA) was created to administer the program. Any breeder could be a member of BGA. According to the members' regulations, voting strength was proportional to the amount of expenses the member bore. Expenses, in turn, were assessed in proportion to the amount of royalties collected on the breeder's new varieties. The practical effect of these provisions was to secure control of BGA in Yoder's hands. The bylaws and articles of incorporation of BGA indicated that its primary purpose was to insure a measure of remuneration to the breeders. A breeder would list his new variety of ornamental plant with BGA, and BGA would make plant material of that variety freely available to propagator-distributors. The breeder members of BGA agreed on the amount of royalty to be charged. Significantly, during most of the time that the BGA program was in existence, it was administered within Yoder's offices.
 
 
 16
 Three kinds of agreements were used in administering the BGA program. The first was the Propagator-Distributor Agreement, which permitted the signatory to make any desired commercial use of purchased cuttings or cuttings harvested from the stock plants. Participating propagator-distributors had an obligation to send a grower or grower license agreement to customers who wanted to purchase a BGA variety. For each cutting sold, the propagator-distributor had a contractual obligation to pay BGA a $.006 royalty. He also was required to report the number of cuttings sold quarterly, not to give cuttings to non-signatories, to exercise reasonable care to keep others from getting cuttings, and to allow the breeder to inspect and inventory his plantings at all reasonable times. The propagator-distributor agreement also contained a provision whereby the propagator-distributor was entitled to full credit from BGA if he was unable to collect the $.006 royalty from his customers. The agreement required the propagator-distributor to return all mutations and sports to the breeder, who retained all rights to them.
 
 
 17
 Grower License Agreements were signed by self-propagators. These agreements conferred the right to grow and to propagate plants to sell as cut flowers or potted plants. The restrictions and conditions in the agreement were essentially the same as those in the Propagator-Distributor Agreement, except that the royalty payment was to go to the propagator-distributor who had furnished the cutting, instead of to BGA.
 
 
 18
 Finally, the growers signed a Grower Agreement. The Grower Agreement covered growers who purchased cuttings from propagator-distributors for the purpose of selling flowers or potted plants. All propagation rights were again reserved to BGA, and the grower agreed not to propagate without BGA's consent, not to give BGA varieties to others for the purpose of propagation, to allow reasonable inspections, and to return sports.
 
 
 19
 Typically, the BGA program operated as follows: A propagator-distributor would propagate a large number of cuttings of a BGA new variety. For each cutting he sold to a grower or a self-propagator, he would pay BGA $.006. On his invoices to his customers, a base price for the cutting would appear, and separately stated would be the amount of BGA royalty due. Evidence at the trial indicated that the industry was generally aware of the existence of the BGA royalties and understood that these royalties were in essence compensation to the breeders of the new variety. The customer would therefore pay the base price plus royalty to the propagator-distributor, and the latter would in turn remit the full royalty amount to BGA. Thus, the role of the propagator-distributor was that of a BGA administrator; his cooperation was essential in the process of collecting royalties from those who sold or used the protected varieties and channeling the monies to the appropriate breeder.[1]
 
 
 20
 The degree of enforcement of the BGA program was the subject of some dispute at the trial. If Yoder knew that a grower or a self-propagator had not signed a BGA agreement, it would not ship the requested BGA variety. Instead, a substitute variety would be sent. On the other hand, the testimony indicated that a substantial number of complaints were voiced about the lack of enforcement of the BGA program against non-signatories. No lawsuits were ever filed. If a grower or self-propagator went out and purchased his mother stock from a retail florist, for example, there was nothing that Yoder could or would do about the fact that he had obtained a protected variety without signing a contract. Yoder explained its lack of enforcement by the need to maintain good will in the industry. If a grower member informed BGA that someone had access to BGA varieties who had not signed the contract, a BGA representative would check with the alleged pirate and try to persuade him to become a member. Yoder's representative testified that in almost every case, once the purpose of the BGA system was explained to a non-participant, the grower or self-propagator would usually agree to sign a contract and to pay the royalty to BGA. From Cal-Florida's perspective, Yoder's tactics were tantamount to strong-arming. Both parties agreed that new varieties were helpful to everyone in the industry. It was Yoder's position that BGA, by providing a means for breeder compensation, was helping in the development of new varieties of chrysanthemums.
 
 
 21
 The GRA program, (Grower Rights Agreement) developed by Yoder in 1968 to supplement BGA, was similar to the latter program in many ways. When a grower or propagator-distributor or self-propagator discovered a mutation on plant material that was not covered by a BGA agreement (in other words, any free plant), he could send the mutation to Yoder Brothers for evaluation of its commercial possibilities. After extensive testing, if Yoder decided that the new variety could profitably be introduced, the grower who discovered the variety would be entitled to 50% of the royalty return. The agreements used to administer GRA followed the BGA pattern a Propagator-Distributor Agreement, a Grower License Agreement, and a Grower Agreement. Unlike BGA, under GRA the royalties collected were returned directly to Yoder. The amount of the royalty under GRA was again $.006 per cutting.[2]
 
 
 22
 Cal-Florida participated in the BGA and GRA programs only as a propagator-distributor. Although it did conduct a breeding program of its own during the 1960's, it never registered any new varieties with BGA. Instead, it developed the CFPC program. The CFPC program used the same three kinds of agreements as the BGA program the propagator-distributor contract, the grower-propagator license, and the grower agreement. In one aspect, however, the CFPC program was more restrictive than the BGA program: sales to self-propagators and other propagator-distributors were prohibited. The royalty rate was the same $.006 per cutting. Like the BGA program from which it was copied, the CFPC program's basic purpose was to obtain remuneration for the company's breeding efforts. Sports discovered by participants in the CFPC program were required to be returned to Cal-Florida, the breeder.
 
 
 23
 As a propagator-distributor participant in the BGA program, Cal-Florida of course paid royalties to BGA. During the relevant period, CFPC and CFPCF combined paid $229,805.12 in BGA royalties and $27,941.18 in GRA royalties a total of $257,746.30. The evidence showed that over the years, more and more of Cal-Florida's sales were of varieties controlled by Yoder under either BGA or GRA. In 1963, 0.19% of their cutting sales were BGA or GRA varieties; by 1969, the number had grown to 17.59% of total sales, and by 1971, to 41.22%.
 
 
 24
 BGA and GRA royalties were always separately stated on Cal-Florida's invoices to its customers. In addition, the following explanation was to be found in its catalogs:
 
 
 25
 BGA (BREEDER GROWER AGREEMENT) VARIETIES. The California-Florida Plant Corp. is licensed by BGA International to propagate and distribute BGA varieties. The terms of our Propagator-Distributor Contract call for the customer to sign a BGA Agreement prior to the shipment of any BGA variety.
 
 
 26
 BGA varieties are subject to all discounts of Volume, Advance Order and Prompt Payment. The current BGA Royalty is $0.60 per 100 cuttings, rooted or unrooted, and is in addition to the listed base price. BGA Royalties are not subject to Discount or Adjustment of any kind and the total amount of BGA Royalty collected by us is returned to BGA International.
 
 
 27
 GRA (GROWER RIGHTS AGREEMENT) VARIETIES. The California-Florida Plant Corp. is licensed to grow, propagate and distribute GRA varieties. The terms of our Propagator-Distributor contract call for the customer to sign a GRA Agreement prior to us shipping any GRA varieties.
 
 
 28
 GRA varieties are subject to all discounts of Volume, Advance Order and Prompt Payment. The current GRA Royalty is $0.60 per 100 cuttings, rooted or unrooted, and is in addition to the base price. GRA Royalties are not subject to Discount or Adjustment of any kind and the total amount of GRA Royalty collected by us is returned to the developer.
 
 
 29
 ROYALTY CHARGES. All Royalty Charges (CFPC, BGA, and GRA) will be billed separately and included in the monthly statement.
 
 
 30
 Thus, CFPC clearly segregated the BGA and GRA royalty charges from the prices charged for the cuttings it sold.
 
 D. Government Intervention
 
 31
 On April 20, 1970, the United States brought an action against Yoder, alleging that the BGA and GRA programs violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The Government's suit ended in a consent judgment entered on March 15, 1972 in the Northern District of Ohio. The consent decree abolished BGA and GRA and prohibited further collection of royalties and further enforcement of the sport return clauses; it also required Yoder to take certain affirmative actions to inform the former participants of the changed status quo. The judgment expressly stated that it did not apply to any rights that Yoder had obtained under the patent laws of the United States or of any foreign country. Cal-Florida had moved to intervene in the Government's case on February 16, 1972. On March 15, 1972, the same day as the consent decree was finally approved, the court denied its motion.
 
 E. Post BGA: Plant Patents
 
 32
 After BGA ended, around the end of 1971, Yoder started patenting some of its new varieties under the Plant Patent Act, 35 U.S.C. § 161 et seq. Several salient differences existed between the rights conferred by a plant patent and the rights secured under the old BGA and GRA agreements. For example, under a plant patent, sports of the patented plant are not covered by the original patent. See Part IV, infra. Second, the royalty event for a patented plant is the asexual reproduction of the plant, instead of its use or sale. Even so, the Plant Patent Act and the BGA/GRA programs were quite similar. Under both, licenses for propagation by others could be issued, and royalties could be charged for the use of the plant. These similarities have led Cal-Florida to allege that Yoder's new use of the plant patent laws is simply a continuation of its old and illegal BGA program. Since BGA and GRA ended, Yoder has secured plant patents on all new varieties it has introduced to the trade. Shortly after the Government suit was terminated, and after extensive unsuccessful negotiations with Cal-Florida, Yoder filed its complaint commencing this litigation. We thus arrive at last at the beginning the procedural history of the case before us.
 
 II. Summary of Proceedings Below
 
 33
 On March 6, 1973, Yoder filed its complaint in the United States District Court for the Southern District of Florida, alleging infringement of twenty-one chrysanthemum plant patents by CFPC and CFPCF. CFPCF answered on April 12, 1973, denying the infringement and setting forth antitrust and trade disparagement counterclaims. On the same day, CFPC moved to dismiss for improper venue under Rule 12(b)(3), Federal Rules of Civil Procedure. In addition, CFPC filed suit in the Northern District of California on June 5, 1973, for a declaratory judgment on the validity of Yoder's patents and for trade disparagement damages. On December 26, 1973, the California action was ordered transferred to the Southern District of Florida pursuant to 28 U.S.C. § 1404(a) (transfer in the interests of justice to district where suit might have been brought). In the first pretrial order, filed January 16, 1974, the district court denied CFPC's motion to dismiss on venue grounds. The two cases were consolidated by an order entered March 4, 1974.
 
 
 34
 The trial before a jury began on April 23, 1974. The issues presented for trial were stipulated by the parties in their joint Pretrial Stipulation and involved both patent and antitrust claims.[3] Yoder claimed infringement and contributory infringement of twenty different United States plant patents by either CFPC or CFPCF or both. The two Cal-Florida companies asserted the invalidity of twenty-two United States plant patents. In its counterclaim, Cal-Florida asserted that Yoder, by its participation in the BGA and GRA programs, combined to restrain trade in violation of Sherman Act § 1, 15 U.S.C. § 1, and further alleged that Yoder had committed acts of monopolization of the trade in chrysanthemum cuttings, in violation of Sherman Act § 2, 15 U.S.C. § 2.
 
 
 35
 At the close of the evidence, the district court directed verdicts on several critical issues. On June 12, 1974, it ruled for Yoder on the issues of patent validity and infringement of all twenty patents, subject to Cal-Florida's claims of contract rights and prior commercial exploitation; additionally, it ruled in Yoder's favor on all issues of inventorship, newness and distinctness, asexual reproduction, and adequacy of description. On June 13, 1974, the court granted a verdict in favor of Yoder on Cal-Florida's monopoly counterclaims. On Cal-Florida's side, the court directed a verdict that Yoder, through the BGA and GRA programs, had participated in a group boycott which constituted a per se violation of Sherman Act § 1. The court denied Yoder's motions for directed verdicts claiming that there was insufficient evidence to sustain a verdict: (1) that BGA and GRA were illegal; (2) that CFPC and CFPCF were injured as a result of the BGA and GRA programs (i. e. lack of "fact of damage"); (3) that CFPC and CFPCF were in the "target area" of the BGA and GRA programs (i. e. that they had standing to sue under the antitrust laws); and (4) that any damages were supportable, since the damage proof and theories were legally improper, factually unsupported, and speculative.
 
 
 36
 The patent claims were submitted to the jury on special interrogatories. The antitrust claims, in contrast, were submitted under a general verdict form. Two theories of antitrust damages were submitted to the jury: the royalty payments theory, and the price differential theory. In connection with the royalty payments theory, the jury was told that unless the BGA and GRA systems were analogous to a "pre-existing cost plus contract," they would not be permitted to consider whether Cal-Florida had "passed on" the incidence of the royalties paid under those programs to its customers. This theory was submitted over Yoder's strenuous objection. The price differential theory, based on evidence showing the comparative prices charged by CFPC and CFPCF (taken together) and Yoder, permitted the jury to find that the Cal-Florida companies were damaged to the extent that their prices were lower than Yoder's. Again Yoder voiced its objection both to the introduction of this evidence and to the jury's consideration of that theory. On June 21, 1974, after eight days of deliberation, the jury returned its verdict, finding a violation of section 1 of the Sherman Act, causation and damages in the amount of $64,500 for CFPC and $64,500 for CFPCF. With regard to the patent issues, the jury found that CFPC and CFPCF had established a contractual right to use eight of the patented plants. For another seven patented plants, the court had instructed the jury that the patents were valid and infringed as a matter of law; as to these, the jury awarded compensatory damages. The jury also awarded damages on one patent, covering the "Deep Conquest" chrysanthemum, which it found valid and infringed. It was unable to reach a verdict on the rest of the patents.
 
 
 37
 On this appeal, we are concerned only with the seven patents that the district court declared valid and infringed as a matter of law and with Deep Conquest. For those patents, the court trebled the amount of the damages found by the jury, giving Yoder a total recovery of $66,917.64.[4] Following the jury verdict, Yoder moved for judgment notwithstanding the verdict as to the award of damages to CFPC and CFPCF and, in the alternative, moved for a new trial as to the award to CFPCF only, for reasons related to the amount of the damage award. In orders dated January 16, 1975, and March 4, 1975, the court denied Yoder's post-trial motions. Thus, on April 3, 1975, Yoder noticed its appeal; on April 14, 1975, CFPC and CFPCF responded with notices of their cross appeal.III. Antitrust Appeal
 
 
 38
 On appeal from the antitrust judgment rendered against it, Yoder raises three main issues: (1) that judgment should be entered for it because appellees lack standing to sue under section 4 of the Clayton Act, 15 U.S.C. § 15; (2) that the lower court's ruling that the BGA and GRA programs were per se illegal group boycotts was incorrect; and (3) that neither of the two possible theories of damages the "price differential" theory or the "royalty payments" theory could provide a basis for the jury's award. Cal-Florida raises both antitrust and patent claims on its cross appeal. On the antitrust issues, it argues that the district court erroneously granted Yoder's motion for a directed verdict on the Sherman Act § 2 claim of monopolization and attempted monopolization. Its other antitrust point asserts that the district court erred in denying it the benefit of the tolling provision of 15 U.S.C. § 16(i), the Clayton Act statute of limitations.
 
 
 39
 We have decided that the district court correctly ruled that Cal-Florida had standing to challenge the BGA and GRA programs and that those programs were per se violations of section 1 of the Sherman Act. Furthermore, we find that the court's ruling that Cal-Florida had failed to show a section 2 claim of monopolization or attempted monopolization was justifiable. Finally, although the lower court correctly ruled that Cal-Florida was not entitled to the tolling provisions contained in 15 U.S.C. § 16(i), it erroneously admitted evidence comparing Yoder's and Cal-Florida's prices. Since the jury may have relied on the price differential theory in its award of damages, we must remand the antitrust claims to the trial court for further proceedings. In this connection, we note that the district court should have disallowed Yoder's "passing on" defense as a matter of law, rather than submitting it to the jury.
 
 
 40
 In the interest of an orderly discussion of the issues before us, we have decided to organize them as follows: (1) whether Cal-Florida had standing to sue under section 4 of the Clayton Act, 15 U.S.C. § 15; (2) whether the Government's suit was still "pending" at the time Cal-Florida filed its antitrust claims, thereby entitling Cal-Florida to the benefit of the tolling provision of the statute of limitations under Clayton Act section 4B, 15 U.S.C. §§ 15b, 16(i); (3) whether the BGA and GRA programs were illegal per se under section 1 of the Sherman Act, 15 U.S.C. § 1; (4) whether Cal-Florida failed to prove a relevant market as a matter of law for purposes of Sherman Act § 2, 15 U.S.C. § 2, and whether it failed to show dangerous probability of success in such market; and (5) whether Cal-Florida successfully proved fact of damage and causation under its price differential and royalty payments theories of damages.
 
 A. Standing to Sue
 
 41
 Section 4 of the Clayton Act provides in pertinent part:
 
 
 42
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . .
 
 
 43
 15 U.S.C. § 15. Focusing on the "by reason of" language, Yoder argues that private enforcement of the antitrust laws should be granted only to those plaintiffs who suffer sufficiently direct injury that it is proper that they act as private attorneys general. Additionally, they note this Court's language in Jeffrey v. Southwestern Bell, 5 Cir. 1975, 518 F.2d 1129, 1131:
 
 
 44
 The "target area" test (for standing) arose as a means of limiting the class of potential treble-damage plaintiffs to those persons who could most adequately vindicate the purposes of the antitrust laws.
 
 
 45
 Those purposes include, according to Yoder, the twin goals of easing the burden on the courts of meritless antitrust claims while at the same time furthering the deterrent impact of the laws on anticompetitive business behavior.
 
 
 46
 Yoder directs our attention to the Supreme Court's comment in Hawaii v. Standard Oil Co., 1972, 405 U.S. 251, 92 S.Ct. 885, 891-92 n. 14, 31 L.Ed.2d 184, noting the virtual unanimity of the lower courts in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. The question of standing, Yoder argues, is a legal question for the court to resolve. Starting with the proposition that the Fifth Circuit has adopted the "target area" test for standing, Yoder suggests that the purpose and specifically intended impact of the violative conduct must be to injure the alleged victim. Furthermore, the area of the economy wherein the impact of the violation is felt must be specifically foreseeable. Applying its proposed test, Yoder concludes that propagator-distributors were not the targets of the BGA and GRA programs, because only growers and self-propagators suffered out-of-pocket expenses due to the royalties. Propagator-distributors merely collected royalty payments from growers and self-propagators and transmitted those monies to BGA or Yoder. Neither program was designed to hurt CFPC and CFPCF, nor was Yoder in its capacity as propagator-distributor helped vis a vis CFPC and CFPCF by BGA and GRA. From these premises, Yoder concludes that neither CFPC nor CFPCF was injured in its business or property by reason of a violation of the antitrust law and that this Court should dismiss their action for lack of standing.
 
 
 47
 In response to Yoder's arguments, Cal-Florida argues that a "direct injury" test should apply. It suggests that the courts have followed a twofold traditional tort analysis: (1) was there causation in fact; and (2) was the violation a proximate cause of the victim's injuries. Both of these questions are questions of fact which should be submitted to the jury. Finally, Cal-Florida asserts that the Fifth Circuit's "target area" test, expressed in Battle v. Liberty National Life Ins. Co., 5 Cir. 1974, 493 F.2d 39, cert. denied, 1975, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807, is the equivalent of the tort analysis that it proposes.
 
 
 48
 Applying its test, Cal-Florida first asserts that the royalty payments that it made to BGA and to Yoder were directly caused by Yoder's act i. e. Yoder's requirement that it sign Propagator-Distributor Agreements. Second, it argues that the illegal BGA program was a factor in depressing Cal-Florida's overall prices for chrysanthemum cuttings. Third, it alleges that it lost sales because the royalty imposed on BGA varieties caused prices to be so high that some growers turned to self-propagation. Finally, it maintains that all three elements of damage were foreseeable. From this, it concludes that the evidence was adequate for the jury to consider the issue of causation and, in accordance with the court's instructions, to render a special verdict against Yoder.
 
 
 49
 We begin our analysis of this problem by noting that standing to sue is a preliminary matter, to be evaluated upon the allegations of the complaint. See Malamud v. Sinclair Oil Corp., 6 Cir. 1975, 521 F.2d 1142, 1150. Cf. Battle v. Liberty National Life Ins. Co., supra, 493 F.2d at 48. This Circuit's test for standing was recently expressed in Jeffrey v. Southwestern Bell, supra, as follows:
 
 
 50
 To attain standing a person (whether corporation or individual) must be one against whom the conspiracy is aimed. Or, put in plutonomic terms, the complainant must show that he is within that section of the economy which is endangered by a breakdown of competitive conditions in a particular industry.
 
 
 51
 518 F.2d at 1131. See Tugboat, Inc. v. Mobile Towing Co., 5 Cir. 1976, 534 F.2d 1172 (1976); Battle v. Liberty National Life Ins. Co., supra, 493 F.2d at 49. See also Southern Concrete Co. v. United States Steel Corp., 5 Cir. 1976, 535 F.2d 313 (1976); Buckley Towers Condominium, Inc. v. Buchwald, 5 Cir. 1976, 533 F.2d 934. One might win the battle of standing to sue but still lose the war on another issue, such as the violation issue, see E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm., 5 Cir. 1972, 467 F.2d 178, cert. denied, 1973, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690, or the damages issue.[5]
 
 
 52
 A test focusing on the sector of the economy is more easily stated than applied. The Ninth Circuit suggested one approach in In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 9 Cir., 481 F.2d 122, 129, cert. denied sub nom. Morgan v. Automobile Mfr's Ass'n, 1973, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336:
 
 
 53
 A proper application of "by reason of" focuses on whether the anti-competitive conduct directed against an area of the economy injured business operations conducted by the claimant in that sector of the economy. The resulting two-step approach first requires identification of the affected area of the economy and then the ascertainment of whether the claimed injury occurred within that area.[6]
 
 
 54
 Examining Cal-Florida's complaint, we find first the undisputed fact that both CFPC and CFPCF were involved as propagator-distributors in the chrysanthemum production industry. Next, we find that the two companies alleged that purchasers of BGA and GRA cuttings were required to pay a royalty, to the purchasers' injury, as a result of the illegal programs. Propagator-distributors, including CFPC and CFPCF, were among those who purchased cuttings under BGA and GRA. Furthermore, they pointed out other restrictions which were also imposed on propagator-distributors, pursuant to the programs, including the obligation to return sports of BGA and GRA cuttings, the fixing of the royalty amount, and restrictions on which of their customers could receive BGA and GRA cuttings. These claims were summarized in the amended answer and counterclaims of both defendants in paragraph 16(h) as follows:
 
 
 55
 CFPC and CFPCF were and continue to be damaged in their business through, inter alia, over-payment for cuttings by the payment of royalties, loss of past profits, loss of future profits, loss of sales, and the prospective destruction of its business.[7]
 
 
 56
 From these allegations, we see that one affected area of the economy against which the anti-competitive conduct was directed was the propagator-distributor level of chrysanthemum production. CFPC and CFPCF clearly fall within this area. The claimed injuries included the payment of royalty to BGA and to Yoder. In fact, propagator-distributors literally sent royalty checks drawn on their own accounts to BGA and Yoder. Propagator-distributors were necessary participants in the BGA and GRA schemes, even if their role was simply that of an administrator of the program or a conduit for the funds. Unless propagator-distributors cooperated with the restrictions on access to protected varieties for non-signatories, the programs could not operate. The restrictive effect of the BGA combination on the amount of royalty charged by different breeders could have been felt directly by a propagator-distributor. The administrative burdens of the BGA and GRA programs might have dissuaded propagator-distributors from participation or imposed some illegal economic burden on them. Finally, the effect of the two programs would almost certainly have been different for Yoder than for other propagator-distributor participants, because of Yoder's vertical integration of the breeder function and the propagator-distributor function. Yoder qua propagator-distributor would have been more than happy to return sports of BGA varieties to Yoder qua breeder, whereas another propagator-distributor might have preferred to keep the sport for himself. Cal-Florida was therefore clearly disadvantaged competitively by the existence of the BGA and GRA programs.
 
 
 57
 All of the foregoing considerations convince us that Cal-Florida's claimed injuries did occur within a sector of the economy which was endangered by the BGA and GRA programs. Moreover, because Yoder certainly did intend to operate the BGA program, and because it indisputably did intend to secure compensation for breeders in the industry and to get sports back to the breeders, we believe that it must have intended the necessary consequences of its acts, thus satisfying whatever purpose and intention requirement might exist for standing under section 4. One need not be sitting on the bull's-eye in order to be within the target area of an antitrust conspiracy.[8] We therefore find that Cal-Florida did have standing to seek treble damages under section 4 of the Clayton Act.
 
 B. Statute of Limitations
 
 58
 Section 4B of the Clayton Act, 15 U.S.C. § 15b, provides a four year statute of limitations for actions brought under section 4 of the Clayton Act, 15 U.S.C. § 15. If the private action has been preceded by a Government proceeding and if it is based in whole or in part on any matter complained of in the Government's action, then under Section 5(b) of the Clayton Act, 15 U.S.C. § 16(i),[9] the statute of limitations is tolled during the pendency of the suit by the United States and for one year thereafter. The tolling provision of the statute has the effect of giving antitrust plaintiffs a period of four years plus the length of the Government suit for which they can recover.
 
 
 59
 The United States instituted its suit against Yoder Brothers and BGA on April 20, 1970. On January 26, 1972, Yoder and the United States filed a stipulation containing a proposed consent decree which would become effective thirty days following the filing date. On February 16, 1972, CFPC and CFPCF moved to intervene in the consent proceeding. The district court denied both motions on March 15, 1972, and entered the consent decree on that date. Over a year later, on April 12, 1973, CFPCF's counterclaim alleging antitrust violations was filed. Even later, on June 5, 1973, CFPC's counterclaim under the antitrust laws was filed.
 
 
 60
 CFPC and CFPCF seek to escape the consequences of their tardy filing by arguing that the Government's action did not cease to "pend" until the statutory periods provided for appeal elapsed. They assert that they were entitled to the full sixty days provided under the Expediting Act, 15 U.S.C. § 29, to appeal from the denial of their motions to intervene.[10] Additionally, since the parties to the lawsuit might have appealed from the provisions of the consent decree, they assert that the Government's suit continued to pend until May 15, 1972, thus making CFPCF's filing date within the one year period following the end of the Government's suit. CFPC's claim, since it was filed on June 5, would still have to relate back to the Florida filing date in order to be timely.
 
 
 61
 Yoder argues that the Government's suit ceased to pend on the date that the consent decree was entered and relies in the first instance on three Supreme Court cases in which the Court assumed that the date on which the judgment or decree is entered governed. American Pipe & Constr. Co. v. Utah, 1974, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713, 731; Zenith Radio Corp. v. Hazeltine Research, Inc., 1971, 401 U.S. 321, 91 S.Ct. 795, 803-04 n. 5, 28 L.Ed.2d 77; Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 1965, 381 U.S. 311, 85 S.Ct. 1473, 1475, 14 L.Ed.2d 405. Because the question of when government proceedings cease to "pend" for purposes of Section 5(b) was not squarely before the Court in any of those cases, we do not regard them as dispositive of the question. Rather, we examine the problem in the light of the precedents more directly on point to decide whether the date that the judgment or decree was entered or the date when the time for appeal expired governs.
 
 
 62
 The Ninth Circuit considered a question analogous to the one before us in Marine Firemen's Union v. Owens-Corning Fiberglass Corp., 9 Cir. 1974, 503 F.2d 246. The Marine Firemen's Union had filed a private antitrust action against the Owens-Corning Company alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1. Marine's action followed a criminal proceeding that had been brought by the United States on December 28, 1964, which had also alleged a combination and conspiracy in violation of Sherman Act § 1. On February 6, 1969, the last of the defendants entered a plea of nolo contendere in those proceedings. On February 17, 1969, the district court orally pronounced its sentence. However, the judgment of conviction on those pleas was not signed by the sentencing judge until February 19, 1969; the clerk entered the judgment on February 20, 1969. Marine's action was instituted on February 18, 1970, less than one year after entry of the judgment, but more than one year after entry of the plea and oral pronouncement of the sentence.
 
 
 63
 In the subsequent private action, the district court ruled that the "pendency" of the Government's criminal proceedings terminated on February 17, 1969, when the defendants were orally sentenced. Reversing, the Ninth Circuit held that the pendency of the Government's case "continues for a period of one year from and after the date of entry of judgment of conviction against the last remaining defendant in the related criminal proceeding." 503 F.2d at 249. (Emphasis in original.)[11] The court made the following comment on the judicial administration aspect of the problem:
 
 
 64
 Case law chaos results if different procedural points and dates thereof are to be for one reason or the other selected as the commencement date of time limits on the myriad of post judgment remedies open to any given party, such as appeal, motions for new trial, reduction of sentence or filing of costs bills, to name a few. Orderly procedural necessity dictates uniformity. We sense no logical reason to differentiate the procedural point or date of final adjudication and termination of the "pendency" of a given criminal proceedings (sic) for the purpose of computing statute of limitations time from that of calculating appeal time for any given party. Accordingly, we hold that the "pendency" of the related criminal proceeding referred to in § 16(b) (§ 16(i)) terminates at the procedural point and date of the clerk's notation in the "criminal docket" for the case of the entry of the judge's signed written judgment of conviction of the last remaining defendant in the criminal proceeding.
 
 
 65
 503 F.2d at 250. The court did not reach Marine's contention that the "pendency" of the criminal proceeding continued through appeal time.
 
 
 66
 Although Marine Firemen's Union arose in the case of a private action following a criminal proceeding, and upheld the litigants right to the tolling period, we believe that its reasoning is equally applicable here. Rule 58 of the Federal Rules of Civil Procedure provides that "a judgment is effective only . . . when entered as provided in Rule 79(a)." Rule 79(a) directs the clerk to enter all papers chronologically in the civil docket and specifically provides that "the entry of an order or judgment shall show the date the entry is made." Rule 4 of the Federal Rules of Appellate Procedure relies on the date of the entry of the judgment or order appealed from for determining the time for appeal. Unless either the district court or the appellate court grants a stay pending appeal, execution can normally take place on a final judgment of a district court. Fed.R.Civ.P. 62, Fed.R.App.P. 8.
 
 
 67
 Particularly with respect to consent decrees, it makes sense to look to the date of the entry of the decree. Since the scope of review of consent decrees is extremely narrow, the outcome of the lawsuit is practically certain as of the time the decree is entered. Generally, the only matters that can be raised on appeal are lack of jurisdiction over the subject matter or facts which would vitiate the consent. Martin Marietta Corp. v. FTC, 7 Cir., 376 F.2d 430, 434, cert. denied, 1967, 389 U.S. 923, 88 S.Ct. 237, 19 L.Ed.2d 265. See Fuller v. Branch County Road Comm'n, 6 Cir. 1975, 520 F.2d 307. Thus, cases involving consent decrees may be distinguishable from cases in which the Government action terminated in a final judgment after full litigation. Deciding a case in the latter category, the Second Circuit decided that the "pendency" of a Government enforcement action continues until the expiration of the time to appeal from the final decree. Russ Togs, Inc. v. Grinnell Corp., 2 Cir., 426 F.2d 850, 857, cert. denied, 1970, 400 U.S. 878, 91 S.Ct. 119, 27 L.Ed.2d 115. The court rested its decision on the ground that
 
 
 68
 (a) judgment or decree in a government enforcement action becomes "final" only when the government and the defendants are satisfied with the result and determined not to appeal. Therefore, only after the time to appeal has expired can private litigants rely on the irrevocability of determinations made in the government action.
 
 
 69
 426 F.2d at 857. Even the Russ Togs court did not require absolute irrevocability of determination, however, for the court expressly refused to hold that pendency included the period subsequent to a final decree during which a court exercises continuing jurisdiction for purposes of modification and enforcement. 426 F.2d at 856 n. 8. Rather, the court's concern appeared to be with the ability of private litigants to rely upon the finality of the provisions in the judgment or decree. When the Government litigation terminates in a consent decree, parties will rarely, if ever, be injured by reliance on the decree's provisions. Thus, even taking into account the concerns of the Russ Togs court, we see no reason to include the time for appeal within the "pendency" of the Government's suit in the circumstances sub judice.[12]
 
 
 70
 Here, since the Government proceedings terminated in a consent decree, we hold that the Government's action ceased to "pend" for purposes of section 5(b), 15 U.S.C. § 16(i), on March 15, 1972, the date on which the consent decree was entered. Therefore, since neither CFPC nor CFPCF filed its claim within one year of that date, neither company is entitled to take advantage of the tolling provision of section 5(b). Each is relegated to the four year statute of limitations contained in section 4B, 15 U.S.C. § 15b.
 
 
 71
 Yoder also attacked the district court's ruling that the CFPC claim filed on June 5, 1973, could relate back for statute of limitations purposes to the filing date of CFPCF's counterclaim, on April 11, 1973. If Yoder is correct, then the CFPC claim would cover only the period from June 5, 1969, onward. We have decided not to disturb the lower court's ruling on this point. In light of the close parent-subsidiary relationship between the two companies, the identity of their business, and the identity of their claims, we think the court properly held that all claims were to be measured from April 11, 1969.
 
 C. Per se Illegality of BGA and GRA
 
 72
 Section 1 of the Sherman Act prohibits "(e)very contract, combination . . ., or conspiracy, in restraint of trade . . . ." 15 U.S.C. § 1. Although generally this section prohibits only "unreasonable" restraints on competition, see Standard Oil Co. v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, the Supreme Court has written that:
 
 
 73
 (T)here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, (60 S.Ct. 811, 883, 84 L.Ed. 1129); division of markets, United States v. Addyston Pipe & Steel Co., (6 Cir.), 85 F. 271, aff'd, 175 U.S. 211, (20 S.Ct. 96, 44 L.Ed. 136); group boycotts, Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, (61 S.Ct. 703, 85 L.Ed. 949); and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, (68 S.Ct. 12, 92 L.Ed. 20).
 
 
 74
 Northern Pacific Ry. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545.
 
 
 75
 In United States v. General Motors Corp., 1966, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415, the Court reaffirmed its position that group boycotts are among those classes of restraints that are illegal per se. To label an arrangement a group boycott, however, is merely to state a conclusion. In order to determine whether or not the label fits, it is necessary to ascertain whether
 
 
 76
 the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a "naked restraint of trade."
 
 
 77
 E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm., 5 Cir. 1972, 467 F.2d 178, 187, cert. denied, 1973, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690. See Sulmeyer v. Coca Cola Co., 5 Cir. 1975, 515 F.2d 835, cert. denied, 1976, --- U.S. ----, 96 S.Ct. 1148, 47 L.Ed.2d 341.
 
 
 78
 The McQuade Tours court discerned three categories of cases in which collective refusals to deal were condemned as per se violations of section 1. In our opinion, the third category comes closest to describing the fact situation before us.[13] In that group of cases, the combinations were designed to influence coercively the trade practices of boycott victims, rather than those of direct competitors.
 
 
 79
 The leading case of this type is Fashion Originators' Guild of America, Inc. v. FTC, 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (hereinafter referred to as FOGA ). In FOGA, a combination of women's garment designers, textile manufacturers, and textile dyers, in an effort to stamp out "style piracy," refused to sell their products to retailers who purchased and sold garments that were surreptitiously copied from the FOGA designers. Retailers were required to sign agreements that assured their cooperation with the FOGA boycott; those who did not sign would not receive original designs from FOGA participants. The FOGA system was enforced by anonymous visits to retail outlets, audits of members' books, and a variety of prohibitions on members' business practices.
 
 
 80
 The Supreme Court held that FOGA's refusal to deal with retailers who patronized style pirates was illegal per se. Because the purpose and object of the combination was to destroy one type of manufacture and sale that competed with FOGA members i.e. imitation the Court found irrelevant FOGA's proffered evidence tending to show that the program was reasonable since it protected all persons in the manufacturing chain from the evils of style piracy.
 
 
 81
 Like the ill-fated FOGA system, BGA required all persons who wanted access to new varieties developed by its breeder members to sign an appropriate BGA agreement. Propagator-distributors were forbidden to sell, loan, or in any way to place BGA cuttings in the hands of nonsignatories. Like FOGA, BGA had the right to audit members' books. Like FOGA, BGA contained other restrictions on members' business practices most importantly, the requirement that all sports found on BGA varieties be returned to BGA. Like FOGA, if a potential customer refused to sign an agreement, the requested BGA variety would not be sent to him. Finally, unlike FOGA but like General Motors, supra, an indispensible part of the BGA program was the assessment and collection of a royalty whose amount was fixed in advance by the breeder members of BGA. See384 U.S. at 147, 86 S.Ct. at 1331, 16 L.Ed.2d at 427.
 
 
 82
 We believe that these factors present the kind of exclusionary or coercive conduct characteristic of a "naked restraint of trade," see McQuade Tours, supra.[14] The differences in degree of enforcement between BGA and FOGA, to the extent they existed, do not warrant a contrary conclusion. The central purpose of the BGA program was to ensure that a set royalty was paid on every BGA cutting sold, and that BGA cuttings were not released to those who would not pay.[15] A secondary and equally exclusionary purpose was to retain control over the sports that appeared on BGA plants. In light of all these factors, we hold that the district court correctly ruled that the BGA and GRA programs were per se violations of section 1 of the Sherman Act.[16]D. Monopolization and Attempted Monopolization
 
 
 83
 On this phase of the appeal, Cal-Florida asserts that the district court erred in granting Yoder's motion for a directed verdict on the section 2 claims of monopolization and attempted monopolization. Without specifying what the relevant market was, the court held that Yoder did not have a sufficient share of the market to permit an inference of monopoly power, citing United States v. Grinnell Corp., 1966, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778, and Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir. 1969, 417 F.2d 203. Additionally, the court found that the evidence tending to show dangerous probability of success in an attempt to monopolize was insufficient to go to the jury.
 
 
 84
 Cal-Florida presents two arguments in support of its position: first, that the district court erroneously believed that a defendant had to have something more than 50 percent of the market before a monopolization or an attempt offense could be made out, misinterpreting this Court's Cliff Food Stores decision; and second, that the facts were sufficient to allow the jury to find even a 50 percent market share, depending on how the market is defined. It offers four possibilities for the product market:[17] (1) ornamental plants; (2) chrysanthemums grown; (3) chrysanthemum cuttings sold; and (4) new varieties of chrysanthemum cuttings sold. Yoder responds that Cal-Florida failed to prove a relevant market and mounts various attacks on Cal-Florida's computations attempting to show a market limited to chrysanthemum cuttings.
 
 
 85
 1. Monopolization. In United States v. Grinnell Corp., 1966, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-1704, 16 L.Ed.2d 778, 785-786. The Supreme Court summarized the section 2 monopolization offense as follows:[18]
 
 
 86
 The offense of monopoly under § 2 of the Sherman Act has two elements; (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.
 
 
 87
 Monopoly power, defined as "the power to control price or exclude competition," is measured with reference to a relevant market. United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (sometimes referred to as the Cellophane case). Because the definition of relevant market is essentially a fact question, see Sulmeyer v. Coca Cola Co., supra, 515 F.2d 835, 849, the precise issue we must address is whether the district court correctly ruled that Cal-Florida failed to introduce sufficient evidence to raise a jury question on the market issue. See Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374-75 (en banc).
 
 
 88
 The classic test for determination of the relevant market was stated in the Cellophane case:
 
 
 89
 In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal.
 
 
 90
 351 U.S. at 395, 76 S.Ct. at 1007, 100 L.Ed. at 1280. Products need not be actually fungible in order to qualify as reasonable substitutes. Id.; Telex Corp. v. IBM, 10 Cir., 510 F.2d 894, 917-18, cert. dism'd, 1975, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244. On the other hand, if the differences in the two products' price, use, and qualities become too great, then they can no longer be said to be reasonably interchangeable. Compare United States v. E. I. du Pont de Nemours & Co., supra (broad market definition), with United States v. Grinnell Corp., supra (narrower market definition). Factors such as functional interchangeability, responsiveness of the sales of one product to the price changes of the other, and degree of competition from the potential substitute are all relevant to the market inquiry.
 
 
 91
 If the correct relevant market was all ornamental plants, as Yoder asserts, then the district court's directed verdict was correct, for Yoder's share of the ornamental plant market was less than 20% clearly not enough for monopolization.[19] See United States v. E. I. du Pont de Nemours & Co., supra, 351 U.S. at 379, 76 S.Ct. at 998, 100 L.Ed. at 1272; Cliff Food Stores, Inc. v. Kroger, Inc., supra, 417 F.2d 203, 207 n.2. If Cal-Florida did succeed in raising an evidentiary issue on the reasonable interchangeability of chrysanthemums with other ornamentals, the opposite conclusion would be required.
 
 
 92
 According to Cal-Florida's data, Yoder's share of the proposed market of chrysanthemums grown ranged from 53.9% in 1969 to 49.6% in 1972. Looking at chrysanthemum cuttings taken and sold, Yoder's share went from 61.4% in 1969 to 58.1% in 1972.[20] Finally, Cal-Florida refers to data covering the years prior to the period of limitations showing that Yoder had almost 100% of the new varieties of chrysanthemums registered with BGA. Since the relevance of this last data escapes us, we shall concentrate our attention on the former two proposed product markets.
 
 
 93
 The evidence upon which Cal-Florida relies to show that chrysanthemums were not reasonably interchangeable with other ornamental plants may be summarized as follows. Mr. Tsukushi, the general manager of the California Chrysanthemum Growers Association, testified that the price of chrysanthemum cuttings did not change at the same time or in the same amount as the price of carnation cuttings, and that there was no relationship between price changes of carnation cuttings and chrysanthemum cuttings. Secondly, Cal-Florida considers probative the fact that Mr. Ramsey Yoder did not cite the prices of other ornamental plants as one factor he considered in setting cutting prices. Third, it recites the truism that in order to grow chrysanthemums, a grower must obtain chrysanthemum cuttings. It asserts that growers could not switch crops easily, due to factors such as greenhouse space and layout, watering systems, and the use of lights and cloth. Finally, it points to a lack of testimony showing that commercial propagators of chrysanthemums competed with propagators of rose plants, carnation cuttings, or other immature ornamental plants.
 
 
 94
 Yoder first directs our attention to testimony by Cal-Florida's market expert, Mr. Fossum, to the effect that ultimate consumers would accept any kind of flower. Although Fossum recognized that certain adjustments were necessary before a grower could shift crops, he stated that no barrier existed to prevent such shifts, and that those traders who did not shift when consumer demand changed simply behaved so out of personal choice. Neckar of CFPC, who had formerly been a grower, testified that if the price of one kind of plant material rose too high, he would move to another crop; among the crops he grew were carnations, roses, lilies, poinsettas, cyclamen, calendulas, hydrangeas, violets, and gloxinias. Significantly, Neckar testified that market demand at the ultimate consumer level dictated his choice of how much space to devote to each kind of ornamental.
 
 
 95
 Yoder also refers us to testimony that consumer demand was responsive to price, that consumer demand fluctuated rapidly, and that growers and propagators reacted with the same demand characteristics. Multi-crop growers shifted production within the year, in response to shifts in price and demand. A large number of growers testified that they handled a wide assortment of ornamentals and that consumer demand dictated the way they allocated bench space.
 
 
 96
 Viewing the evidence as a whole, we conclude that Cal-Florida failed to introduce enough evidence supporting a "chrysanthemums only" product market to reach the jury. The testimony was overwhelming that growers, who were Cal-Florida's and Yoder's immediate customers, allocated their crop space according to the demands of ultimate consumers. The demand of ultimate consumers, in turn, was very sensitive to price differences among the ornamentals. See Telex Corp. v. IBM, supra, 510 F.2d at 917-18. Neither the fact that the price of carnations might not have moved down at the same instant that the price of chrysanthemums went up, nor the fact that carnation prices and chrysanthemum prices might not have changed in precisely the same amounts, negates this consumer responsiveness.
 
 
 97
 We are similarly unpersuaded that the fact that a grower was put to some expense and inconvenience to switch crops undermines our conclusion. The Tenth Circuit faced a similar situation in Telex Corp. v. IBM, supra, in which the plaintiff, Telex, was arguing for a relevant market limited to peripheral devices plug compatible with IBM central processing units (CPU's) and the defendant, IBM, was arguing that the market should include all peripheral products (i. e. those plug compatible with other manufacturers' CPU's). Despite the fact that it was necessary to design an interface for the peripheral before it could be used on another manufacturer's CPU, the Tenth Circuit found that the relative ease and minimal cost of designing such an interface required the conclusion that all peripherals were reasonably interchangeable.
 
 
 98
 In our opinion, Cal-Florida failed to show that the cost and inconvenience to growers of switching crops was so high that a commitment to chrysanthemum growing made it impractical or impossible to respond to a shift in consumer demand. On the contrary, all of the evidence showed that such shifts were feasible and common. Thus, this factor cannot help Cal-Florida.
 
 
 99
 Because the correct product market was ornamental plants, and Yoder's share of that market was approximately 20%, we hold that as a matter of law Yoder could not have been guilty of monopolization. We therefore affirm the district court's directed verdict for Yoder on the monopolization claim.
 
 
 100
 2. Attempted Monopolization. In order to prove attempted monopolization, the plaintiff must show an intent on the defendant's part to bring about a monopoly and a dangerous probability of success. Swift & Co. v. United States, 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518. See Sulmeyer v. Coca Cola Co., supra, 515 F.2d at 850; Cliff Food Stores, Inc. v. Kroger, Inc., supra, 417 F.2d at 207. See generally Turner, The Scope of "Attempt to Monopolize," 30 Rec. of Ass'n of Bar of N.Y.C. 487 (1975). Like the monopolization offense, the attempt offense must occur within a defined relevant market. See Sulmeyer v. Coca Cola Co., supra.
 
 
 101
 Our conclusion that the relevant market was ornamental plants applies with equal force to Cal-Florida's attempt claim. Although we have found that BGA and GRA were per se violations of section 1, we agree with the district court that Cal-Florida failed to prove a dangerous probability that Yoder would succeed in monopolizing the ornamental plant industry. Indeed, Cal-Florida's own arguments implicitly concede that no attempt offense could be established if the market is ornamental plants, since those arguments all presume a market limited to chrysanthemums. Barriers to entry were low in the ornamental plant industry; conditions were highly competitive. In light of these factors, and Yoder's 20% market share, we hold that the district court properly ruled for Yoder on the attempted monopolization claim as well.
 
 E. Damages
 
 102
 After the close of the evidence, Yoder moved for a directed verdict on the grounds, inter alia, that the evidence was insufficient to show fact of damage and that the two damage theories offered were legally improper, factually unsupported, and speculative. The court overruled the motion. Upon receipt of the jury's verdict, Yoder moved for judgment n. o. v. pursuant to Rule 50(b), Fed.R.Civ.P., and in the alternative for a new trial with respect to CFPCF's damages pursuant to Rule 59, Fed.R.Civ.P. This motion was likewise denied.
 
 
 103
 Cal-Florida's damages must be sustained, if at all, on the basis of one or both of the theories under which the case was tried and submitted to the jury. The first of these is the royalty payments theory, which asserts that Cal-Florida is entitled to recover the full amount of royalties paid to BGA International for BGA varieties and to Yoder for GRA varieties. As to this theory, the issues before us are whether Cal-Florida submitted enough evidence on the fact of damage to get to the jury, whether the court correctly ruled that the availability of the so-called "passing on" defense was a question for the jury, and if not, whether Yoder was entitled to the defense as a matter of law. The second theory, labelled the price differential theory by Yoder, relies on the fact that Yoder's average sales income was higher than the average combined sales income of CFPC and CFPCF. Simply stated, the question as to this theory turns on causation: did Cal-Florida submit sufficient evidence of causation to reach the jury? Our review of the law and the sizeable appendix convinces us that the comparative price data was fatally vague and was not shown to be causally related to the antitrust violation. Since the jury may have relied on this theory, this alone would require us to remand the damages issue to the district court. Because the case will be retried, we also consider the royalty payments theory of damages, concluding that the passing on defense was not available to Yoder as a matter of law.
 
 1. Price Differential Theory
 
 104
 The price differential theory rested on evidence of comparative price studies introduced by Cal-Florida over Yoder's objection.[21] The exhibits provided the following information:
 
 
 105
 Yoder launches a broadside attack on the foregoing evidence, correctly pointing out that it does not measure differences in catalog prices for each variety, does not refer to various pricing discounts used by each party, does not determine variety price differences according to quantity sold, does not compare prices to the same kinds of customers, and does not take into account the fact that some Yoder cuttings were sold through brokers. For the computation that lumped together rooted and unrooted cuttings, the proposed damage figure was $1,884,710.16; even when rooted and unrooted cuttings were considered separately, a figure of $633,330 was produced (DX 2227k). Furthermore, Yoder correctly points out that the figure actually represents the sales income that Yoder would have received if it had sold the same number of cuttings as CFPC and CFPCF combined.[22] Additionally, despite the fact that BGA and GRA both ended in 1971 in accordance with the terms of the consent decree in the Government suit, Cal-Florida took the comparison up to 1973. Even if the monopolization claim alone is considered, it is difficult to see how BGA and GRA could have been tools of monopolization two years after termination.
 
 
 106
 Cal-Florida asserts that its comparative price data, detailed above, was admissible to prove the amount of additional income Cal-Florida would have received if its combined average price per cutting had been the same as Yoder's. We must decide whether this evidence could have supported the jury's general verdict, or whether Yoder's motion for directed verdict on this theory should have been granted.
 
 
 107
 Cal-Florida suggests only two possible ways in which the BGA and GRA programs might have been connected to a difference in average price. Johnson, one of CFPCF's witnesses, testified that they could not sell at the same price as Yoder, because Yoder's BGA advertising program had created an appetite for new varieties. Price, CFPC's Operations Manager, testified that if Yoder had been altogether eliminated from the marketplace, Cal-Florida's prices would have been higher.[23] Aside from these two allegations, no purported evidence connecting BGA and GRA to the price disparity existed except a few vague statements to the effect that Cal-Florida felt "excluded" from the marketplace by Yoder.
 
 
 108
 Specific testimony that BGA and GRA did not affect Cal-Florida's prices was common. As mentioned above, Neckar, the Cal-Florida officer in charge of pricing, testified that Cal-Florida charged what it thought was appropriate and that it would not have charged a different amount even in the absence of BGA. He admitted that Cal-Florida's competitors also handled the royalties as a separately labelled and clearly identified charge, which, he said, helped Cal-Florida to charge whatever it wanted. One important reason for Cal-Florida's lower price was because Cal-Florida wanted a little competitive edge. Price's testimony was to the same effect. Almost all of the evidence of customer-switching went in the direction from Yoder to Cal-Florida. The greater figures for so-called lost profits under this theory occurred after the termination of BGA and GRA. The very nature of the theory and proof negated the possibility of predatory price cutting in connection with the monopolization claims; in any event, no evidence of predatory price cuts was introduced. Finally, the evidence offered no meaningful information, since no allowance was made for a number of significant differences between Yoder Brothers and Cal-Florida that more than adequately account for the difference in lump average prices, or sales income: e. g., quality of cuttings, service, warranty, experience, method of marketing, use of discounts, and size of customers.
 
 
 109
 The cases cited by Cal-Florida to demonstrate the probative value of the comparative price evidence are actually amount of damage cases, rather than fact of injury or causation.[24] Bigelow v. RKO Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544; Poster Exchange, Inc. v. National Screen Serv. Corp., 5 Cir. 1970, 431 F.2d 334, cert. denied, 1971, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811. Faced with a similar dearth of specific evidence to prove fact of damage in Shumate & Co. v. National Ass'n of Securities Dealers, Inc., 5 Cir., 509 F.2d 147, cert. denied, 1975, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97, this Court said:
 
 
 110
 (W)ith only his ipse dixit to establish the fact of damage, Shumate would have this Court find his testimonial speculation and contentions supply the basis for a jury issue as to the fact of damage. But more evidence than this is necessary to demonstrate that there has been injury before the jury can be allowed to consider the amount that would properly compensate him for such injury.
 
 
 111
 509 F.2d at 153. See also Southern Concrete Co. v. United States Steel Corp., 5 Cir. 1976, 535 F.2d 313, 317 (summary judgment for defendant appropriate when plaintiff "failed to specify what injuries, if any, it suffered as a result of the violations alleged). Cf. Soloman v. Houston Corrugated Box Co., 5 Cir. 1976, 526 F.2d 389 (affirms summary judgment where only "bald assertions" support the violation element.)
 
 
 112
 In our opinion, the isolated self-serving statements of the Cal-Florida officers were not enough to constitute substantial evidence for the jury on the causation issue under Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365 (en banc) requires a conflict in "substantial evidence" to create a jury question).[25] Therefore, Yoder's motion for directed verdict based on failure to prove causation should have been granted. See Kestenbaum v. Falstaff Brewing Corp., 5 Cir. 1975, 514 F.2d 690, cert. denied, 1976, --- U.S. ----, 96 S.Ct. 1412, 47 L.Ed.2d 349; see also Cinema-Tex Enterprises, Inc. v. Santikos Theaters, Inc., 5 Cir. 1976, 535 F.2d 932 (1976), aff'g, 414 F.Supp. 640.
 
 
 113
 In a similar situation, this Court said in Kestenbaum v. Falstaff Brewing Corp., supra, 514 F.2d at 695:
 
 
 114
 If the jury calculated any part of its damage award on the (impermissibly speculative) sum of Falstaff's price increases to Kestenbaum, it was error. Under the enigmatic general verdict we cannot know whether they did or not, so the verdict cannot stand.
 
 
 115
 Since we too have no idea whether or not the jury relied on the price differential theory, we reluctantly reverse and remand this lengthy case for further proceedings on the damages issue.
 
 2. Royalty Payments Theory
 
 116
 Since the case must be retried on damages, we think it appropriate to reach the complex issues with regard to the royalty payments theory at this time. As indicated above, this theory presumed that Cal-Florida suffered monetary injury in the precise amount of the BGA and GRA royalties charged on its cutting sales. Over Yoder's objection, the court submitted this theory to the jury, together with the question whether a "passing on" defense should be allowed as it was recognized in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 1968, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231.
 
 
 117
 The evidence showed that Cal-Florida of Florida had paid a total of $35,574.52 in BGA royalties from May 1969 to December 1971, when BGA ended, and it had paid a total of $6,731.95 in GRA royalties until that program ended, for a grand total of $42,306.47. Cal-Florida of California had paid $194,230.60 in BGA royalties and $21,209.23 in GRA royalties over the same time period, for a grand total of $215,439.83. Total BGA and GRA royalties paid by both companies equalled $257,746.30. The pretrial stipulation, which the court specifically ordered would govern at trial, provided that
 
 
 118
 (t)he parties stipulate that the amounts of BGA royalties paid by defendants (CFPC and CFPCF) to BGA were the same as the amounts collected by defendants from defendants' customers.
 
 
 119
 On the basis of the instructions and the evidence of royalties paid, the jury awarded $129,000 in damages, to be split evenly between CFPC and CFPCF.
 
 
 120
 Yoder's central point regarding the royalty payments made by Cal-Florida, a propagator-distributor, to BGA and Yoder is that the very structure of the BGA and GRA programs ensured that no propagator-distributor would be in fact injured. In this connection it argues that it was error to submit the theory to the jury in the absence of evidence showing that CFPC and CFPCF were actually injured by either program and that it was error to use the general rule precluding a "passing on" defense articulated in Hanover Shoe to circumvent the evidentiary problem. If the passing on concept was applicable at all, Yoder asserts that it was entitled to invoke the defense under the pre-existing cost plus contract exception of Hanover Shoe.[26]
 
 
 121
 In Hanover Shoe, Inc. v. United Shoe Mach. Corp., 1968, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231, Hanover Shoe, a manufacturer of shoes, charged that defendant United Shoe Machinery Corp. (United), a manufacturer and distributor of shoe machinery, had monopolized the shoe machinery industry through its practice of leasing and refusing to sell its more complicated machinery. As damages, Hanover asked for the difference between what it paid United in shoe machine rentals and what it would have paid if United had sold machines to it instead. Hanover had prevailed in the district court and had been awarded trebled damages; the Third Circuit affirmed. In the Supreme Court, United argued that Hanover had suffered no legally cognizable injury, since the illegal overcharge under the leasing system was reflected in the price at which Hanover sold shoes to its customers, and since Hanover would have charged less if its costs were less and thereby would have made no more profit. Rejecting that argument, the Court held that
 
 
 122
 when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4 (of the Clayton Act).
 
 
 123
 392 U.S. at 489, 88 S.Ct. at 2229, 20 L.Ed.2d at 1239. In the normal case, according to the Court, it was of no legal consequence that the buyer might have left his prices unchanged and absorbed the loss, made adjustments in volume or other costs, or raised his prices. Unwilling to adopt United's proposed analysis the Court explained itself as follows:
 
 
 124
 We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. On the other hand, it is not unlikely that if the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.
 
 
 125
 In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to their customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness.
 
 
 126
 392 U.S. at 492-94, 88 S.Ct. at 2231-32, 20 L.Ed.2d at 1241. (Footnotes omitted.) The Court did not sanction an iron rejection of the defense, however. On the contrary, it indicated that the above-quoted policy factors had impelled it to reject the defense for most cases, but that where those factors were absent, the defense would be allowed:
 
 
 127
 We recognize that there might be situations for instance, when an overcharged buyer has a pre-existing "cost-plus" contract, thus making it easy to prove that he has not been damaged where the considerations requiring that the passing-on defense not be permitted in this case would not be present. We also recognize that where no differential can be proved between the price unlawfully charged and some price that the seller was required by law to charge, establishing damages might require a showing of loss of profits to the buyer.
 
 
 128
 392 U.S. at 494, 88 S.Ct. at 2232, 20 L.Ed.2d at 1242. See generally Pollock, Automatic Treble Damages and the Passing-On Defense : the Hanover Shoe Decision, 13 Antitrust Bull. 1183 (1968).
 
 
 129
 Post-Hanover Shoe cases dealing with the passing on concept fall into two categories: so-called offensive use of passing on, and defensive use. Typical of the offensive use cases is In re Western Liquid Asphalt Cases, 9 Cir. 1973, 487 F.2d 191, cert. denied sub nom. Standard Oil Co. v. Alaska, 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474. In that group of cases, the passing on issue arose in the context of the question whether the remote purchaser would have standing to sue.[27] Hanover Shoe itself exemplified defensive use of passing on, where the question is whether the defendant can avoid liability for damages because the plaintiff passed on the overcharge. Since Yoder is asserting that the burden of the BGA and GRA royalties passed from the propagator-distributors to the growers or self-propagators, to the extent that the passing on concept applies, it is defensive passing on.
 
 
 130
 Although none of the cases since Hanover Shoe have discussed defensive passing on in great detail, we have distilled some general guidelines from the Hanover Shoe decision itself and other cases that we believe should direct the inquiry. First, we believe that the ultimate question of availability of the defense vel non is a legal one for the court. See Obron v. Union Camp Corp., 6 Cir. 1973, 477 F.2d 542; State of Minnesota v. United States Steel Corp., 8 Cir. 1971, 438 F.2d 1380. But see Standard Industries, Inc. v. Mobil Oil Corp., 10 Cir., 475 F.2d 220, cert. denied, 1973, 414 U.S. 829, 94 S.Ct. 55, 61, 38 L.Ed.2d 63 ("passing on" issue submitted to jury, but no discussion of judge-jury allocation point). It was therefore error for the court here to submit the issue to the jury.
 
 
 131
 As the U.S. Steel court recognized, a number of evidentiary questions will often have to be answered before the final legal issue is resolved. Those questions, which might usefully be the subject of special interrogatories in an appropriate case, might inquire as to the evidence on the impact on the price and volume after the alleged overcharge is discontinued, the evidence on how easily ascertainable the amount of the overcharge is, the evidence on the extent of the pass-on, and the evidence as to the nature of the scheme if that is not clear from written documents. Nevertheless, once all those inquiries are resolved, the court must direct whether or not the defense will stand.
 
 
 132
 Secondly, we believe that a flexible, policy-oriented approach should be taken to the application of the limited defense still available. See Obron v. Union Camp Corp., supra ; State of West Virginia v. Chas. Pfizer & Co., 2 Cir., 440 F.2d 1079, cert. denied sub nom. Colter Drugs, Inc. v. Chas. Pfizer & Co., 1971, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115; State of Minnesota v. United States Steel Corp., supra. Particularly, the overriding importance of the private treble damage action in the antitrust enforcement scheme should be kept in mind.
 
 
 133
 Because the critical facts for the passing-on defense were either stipulated or are contained within the BGA and GRA contracts, we can proceed immediately to an application of the law to this case. Cal-Florida, it seems clear, succeeded in the first instance in establishing a prima facie case of damage: it showed that the final price at which it sold chrysanthemum cuttings was illegally high,[28] and it showed that the amount of the overcharge was $.006 per cutting. On the basis of this showing, Cal-Florida was entitled to have the fact of damage presumed, unless Yoder could bring itself within the Hanover Shoe pre-existing cost plus contract exception or rebut the prima facie case in some other way.
 
 
 134
 Yoder's entitlement to the cost plus exception depends on its overcoming the almost "insurmountable" burden of showing that the factors that led the Supreme Court to reject the pass-on defense do not apply to the BGA and GRA programs. We have decided that it failed to meet that burden and thereby to qualify itself for the pre-existing cost plus contract exception. Even if we assume that Yoder had adequately demonstrated that (1) the impact of a single change in the conditions and factors influencing the pricing decision could be measured after the fact, (2) Cal-Florida would not have raised its price and did not maintain the higher price, and (3) persons to vindicate the antitrust laws would be readily available to do so, we think that it did not show the effect of a change in price on total sales and costs per unit for a different volume of total sales.
 
 
 135
 The impact of the higher illegal price on total sales is extremely difficult to measure. Yoder argues that since the only difference between sales pursuant to Cal-Florida's March 1971 price list and the list a year later was the elimination of the illegal royalty, a simple comparison of sales volume for the two years would suffice. However, other economic data, such as the general state of the economy at both times, the entry of a new competitor, or an unexpected external event such as the Arab oil boycott might skew this measurement. Yoder introduced no evidence attempting to adjust for these variables.
 
 
 136
 Yoder also argues that the fact that Cal-Florida suffered no sales decline during the BGA and GRA programs helps to negate this factor. Yet we have no way of knowing whether sales to growers would have increased even more if the cuttings had been available at a lower price. Simple economics suggests that sales would have increased at lower prices. The evidence indicated that growers looked to the total cost of a cutting in deciding what to buy; when that cost became prohibitively high, some growers turned to self-propagation. Each move to self-propagation removed one customer from Cal-Florida's universe of potential customers. The uncertainties surrounding this factor are simply too great, and we conclude that Yoder failed to meet its high burden of dispelling them.
 
 
 137
 The difficulty of estimating the cost per unit for a different volume of sales suffers from the same infirmity. Since the difference in total sales is an uncertain figure, the breakdown of that figure into cost per unit plus profit is equally uncertain. Administration of BGA may have affected cost per unit on those varieties. Because it was Yoder's burden to negate this factor, we attach no significance to Cal-Florida's failure to introduce evidence on administrative costs. Additionally, we know nothing about Cal-Florida's unused capacity. If volume of sales had increased at the lower price, it may have been able to cut down somewhat on marginal cost.
 
 
 138
 The long, complex proceedings feared by the Supreme Court would have been necessary in order adequately to deal with the two factors we have singled out. Until the policy considerations that led the Court to reject the passing on defense are rebutted, a litigant cannot take advantage of the pre-existing cost plus contract exception. Because Yoder did not show the inapplicability of those factors, we hold that the lower court should have ruled that Yoder was not entitled to assert a passing on defense.
 
 
 139
 We note that the BGA and GRA programs do not fit the model of a pre-existing cost plus contract in any case. Two characteristics are essential to such a contract, only one of which was met here: first, the buyer must have his contract with a particular customer for a particular sale before the illegal overcharge is imposed on the buyer, and second, the contractual arrangement must assure that whatever the cost of the product was to the buyer, it is the same to the customer. Unquestionably, the BGA and GRA systems satisfied the latter criterion. They were not pre-existing contracts, however, in the former sense. Volume was indefinite; identity of customer was indefinite. The uncertainty in those terms was exactly the flaw in Yoder's arguments purporting directly to meet the Hanover Shoe policy considerations.
 
 
 140
 Thus, whether the problem is approached by attempting to refute the Court's reasons for disallowing the defense or by trying to come within the exception, Yoder fails. On remand, the fact-finder must be permitted to consider the full amount of the overcharge i. e. the total amount of royalties paid as evidence of damages.[29]
 
 
 141
 To summarize the antitrust part of this case, then, we have held that Cal-Florida did have standing to sue Yoder, that Cal-Florida was not entitled to the benefits of the tolling provision of the statute of limitations, that BGA and GRA were per se violations of section 1, that the relevant market was ornamental plants, that Yoder neither monopolized nor attempted to monopolize that market, and finally, that a remand is necessary on the damages issue.
 
 IV. Plant Patents
 A. Introduction
 
 142
 With the antitrust issues decided, we return to the problem that initially gave rise to this lawsuit Yoder's allegation that Cal-Florida was infringing its plant patents and its consequent demand for damages. Cal-Florida responded with the predictable assertions of patent invalidity and noninfringement, among others. As discussed above, the only issues before this Court concern the seven patents that the district court ruled valid and infringed as a matter of law:[30] Red Torch, Gold Marble, Morocco, Promenade, Southern Gold, Mountain Snow, and Mountain Sun.[31] After considerable thought, we have decided that the district court correctly ruled that Cal-Florida failed to rebut the statutory presumption of validity with sufficient relevant evidence. Nevertheless, we hold that the court should not have trebled the damages found for the infringement, in light of the difficulty and novelty of the issues presented and the good faith defense of invalidity.
 
 B. Constitutional and Statutory Background
 
 143
 Article I, section 8, clause 8 of the Constitution provided that Congress shall have the power:
 
 
 144
 To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries; . . .
 
 
 145
 Although the first legislation implementing this provision for mechanical inventions was passed in 1790 by the first Congress, 1 Stat. 109, see 1 Deller's Walker on Patents § 12, at 93 (2d ed. 1964), Congress did not include plants within the clause's protection until 1930. Act of May 23, 1930, 46 Stat. 376. In its present form, the principal statute allowing patents on plants reads:
 
 
 146
 Whoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than an tuberpropagated plant or a plant found in an uncultivated state, may obtain a patent therefor, subject to the conditions and requirements of this title.
 
 
 147
 The provision of this title relating to patents for inventions shall apply to patents for plants, except as otherwise provided.
 
 
 148
 35 U.S.C. § 161. Since section 161 makes the general patent law applicable to plant patents except as otherwise provided,[32] we take as our starting point the general requisites for patentability, and then apply them as well as we can to plants. See Application of LeGrice, Ct.Cust. & Pat.App.1962, 301 F.2d 929.
 
 
 149
 Normally, the three requirements for patentability are novelty, utility, and obviousness.[33] See, e. g., Graham v. John Deere Co., 1966,383 U.S. 1, 86 S.Ct. 684, 686, 15 L.Ed.2d 545; Van Gorp Mfg., Inc. v. Townley Indus. Plastics, Inc., 5 Cir. 1972, 464 F.2d 16, 17; Ramirez v. Perez, 5 Cir. 1972, 457 F.2d 267, 269. For plant patents, the requirement of distinctness replaces that of utility, and the additional requirement of asexual reproduction is introduced.
 
 
 150
 The concept of novelty refers to novelty of conception, rather than novelty of use; no single prior art structure can exist in which all of the elements serve substantially the same function. See Van Gorp Mfg., Inc. v. Townley Indus. Plastics, Inc., supra. In Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 439 F.2d 1369, 1375, cert. denied, 1970, 400 U.S. 956, 91 S.Ct. 353-54, 27 L.Ed.2d 264, this Court said:
 
 
 151
 (S)ection 102, which pertains to novelty, requires that the patentee be the original inventor of the object claimed in his patent, and also that the invention not have been known or used by others before his discovery of it. . . . Furthermore the prior art is to be considered as covering all uses to which it could have been put.
 
 
 152
 As applied to plants, the Patent Office Board of Appeals held that a "new" plant had to be one that literally had not existed before, rather than one that had existed in nature but was newly found, such as an exotic plant from a remote part of the earth.[34] Ex parte Foster, 90 U.S.P.Q. 16 (1951). In Application of Greer, Ct.Cust. & Pat.App.1973, 484 F.2d 488, the court indicated that the Board believed that novelty was to be determined by a detailed comparison with other known varieties.
 
 
 153
 The legislative history of the Plant Patent Act is of considerable assistance in defining "distinctness." The Senate Report said:
 
 
 154
 (I)n order for the new variety to be distinct it must have characteristics clearly distinguishable from those of existing varieties and it is immaterial whether in the judgment of the Patent Office the new characteristics are inferior or superior to those of existing varieties. Experience has shown the absurdity of many views held as to the value of new varieties at the time of their creation.
 
 
 155
 The characteristics that may distinguish a new variety would include, among others, those of habit; immunity from disease; or soil conditions; color of flower, leaf, fruit or stems; flavor; productivity, including ever-bearing qualities in case of fruits; storage qualities; perfume; form; and ease of asexual reproduction. Within any one of the above or other classes of characteristics the differences which would suffice to make the variety a distinct variety, will necessarily be differences of degree.
 
 
 156
 S.Rep. 315, 71st Cong., 2d Sess. (1930). (Emphasis omitted.) A definition of "distinctness" as the aggregate of the plant's distinguishing characteristics seems to us a sensible and workable one.
 
 
 157
 The third requirement, nonobviousness, is the hardest to apply to plants, though we are bound to do so to the best of our ability. The traditional three part test for obviousness, as set out in John Deere,supra, inquires as to (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the prior art. 383 U.S. at 17, 86 S.Ct. at 694, 15 L.Ed.2d at 556. Accord, Sakraida v. Ag Pro, Inc., 1976, --- U.S. ----, 96 S.Ct. 1532, 47 L.Ed.2d 784; Dann v. Johnston, 1976, --- U.S. ----, 96 S.Ct. 1393, 47 L.Ed.2d 692. Secondary characteristics such as commercial success, long felt but unsolved needs, and failure of others can be used to illuminate the circumstances surrounding the subject matter sought to be patented. Graham v. John Deere Co., supra, 383 U.S. at 17-18, 86 S.Ct. at 694, 15 L.Ed.2d at 556.
 
 
 158
 The Supreme Court has viewed the obviousness requirement of section 103 as Congress' articulation of the constitutional standard of invention. Dann v. Johnston, supra, --- U.S. at ----, 96 S.Ct. at 1397, 47 L.Ed.2d at 698. See Sakraida v. Ag Pro, Inc., supra. In Dann, the Court commented that
 
 
 159
 (a)s a judicial test, "invention" i. e. "an exercise of the inventive faculty," . . . has long been regarded as an absolute prerequisite to patentability.
 
 
 160
 --- U.S. at ----, 96 S.Ct. at 1397, 47 L.Ed.2d at 697-98 (citation omitted). Accord, Sakraida v. Ag Pro, Inc., supra, --- U.S. at ----, 96 S.Ct. at 1535, 47 L.Ed.2d at 789. An "invention" is characterized by a degree of skill and ingenuity greater than that possessed by an ordinary mechanic acquainted with the business. Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683, at 691. The obviousness requirement appears to presume that if the gap between the prior art and the claimed improvement is small, then an ordinary mechanic skilled in the art would have been able to create the improvement, thus leading to the conclusion that the improvement was obvious and a patentable invention not present. Section 103 requires the determination of obviousness vel non to be made with reference to the time the invention was made. See Jacobson Bros., Inc. v. United States, Ct.Cl.1975, 512 F.2d 1065, 1068. Obviousness, like the general question of patent validity, is ultimately a question of law, though factual inquiries are often necessary to its resolution. Sakraida v. Ag Pro, Inc., supra; Graham v. John Deere Co., supra.
 
 
 161
 Rephrasing the John Deere tests for the plant world, we might ask about (1) the characteristics of prior plants of the same general type, both patented and nonpatented, and (2) the differences between the prior plants and the claims at issue. We see no meaningful way to apply the third criterion to plants i. e. the level of ordinary skill in the prior art. Criteria one and two are reminiscent of the "distinctness" requirement already in the Plant Patent Act. Thus, if we are to give obviousness an independent meaning, it must refer to something other than observable characteristics.
 
 
 162
 We think that the most promising approach toward the obviousness requirement for plant patents is reference to the underlying constitutional standard that it codifies namely, invention.
 
 
 163
 The general thrust of the "invention" requirement is to ensure that minor improvements will not be granted the protection of a seventeen year monopoly by the state. In the case of plants, to develop or discover a new variety that retains the desirable qualities of the parent stock and adds significant improvements, and to preserve the new specimen by asexually reproducing it constitutes no small feat.
 
 
 164
 This Court's case dealing with the patent on the chemical compound commonly known as the drug "Darvon," Eli Lilly & Co. v. Generix Drug Sales, Inc., 5 Cir. 1972, 460 F.2d 1096, provides some insight into the problem of how to apply the "invention" requirement to a new and esoteric subject matter. The court first noted that
 
 
 165
 (a)nalogical reasoning is necessarily restricted in many chemical patent cases because of the necessity for physiological experimentation before any use can be determined.
 
 
 166
 In fact, such lack of predictability of useful result from the making of even the slightest variation in the atomic structure or spatial arrangement of a complex molecule . . . deprives the instant claims of obviousness and anticipation of most of their vitality . . ..
 
 
 167
 460 F.2d at 1101. The court resolved the apparent dilemma by looking to the therapeutic value of the new drug instead of to its chemical composition:
 
 
 168
 (R)eason compels us to agree that novelty, usefulness and non-obviousness inhere in the true discovery that a chemical compound exhibits a new needed medicinal capability, even though it be closely related in structure to a known or patented drug.
 
 
 169
 460 F.2d at 1103.
 
 
 170
 The same kind of shift in focus would lead us to a more productive inquiry for plant patents. If the plant is a source of food, the ultimate question might be its nutritive content or its prolificacy. A medicinal plant might be judged by its increased or changed therapeutic value. Similarly, an ornamental plant would be judged by its increased beauty and desirability in relation to the other plants of its type, its usefulness in the industry, and how much of an improvement it represents over prior ornamental plants, taking all of its characteristics together.[35]
 
 
 171
 Before reaching the issues on appeal, we make a final comment about the requirement of asexual reproduction.[36] It has been described as the "very essence" of the patent. Langrock, Plant Patents Biological Necessities in Infringement Suits, 41 J.Pat.Off.Soc. 787 (1959). Asexual reproduction is literally the only way that a breeder can be sure he has reproduced a plant identical in every respect to the parent. It is quite possible that infringement of a plant patent would occur only if stock obtained from one of the patented plants is used, given the extreme unlikelihood that any other plant could actually infringe. See Cole Nursery Co. v. Youdath Perennial Gardens, Inc., N.D.Ohio 1936, 17 F.Supp. 159, 160; Ex parte Weiss, Bd.App.1967, 159 U.S.P.Q. (dictum); Langrock, supra, at 788-89. If the alleged infringer could somehow prove that he had developed the plant in question independently, then he would not be liable in damages or subject to an injunction for infringement.[37] This example illustrates the extreme extent to which asexual reproduction is the heart of the present plant patent system: the whole key to the "invention" of a new plant is the discovery of new traits plus the foresight and appreciation to take the step of asexual reproduction. See Nicholson v. Bailey, S.D.Fla.1960, 182 F.Supp. 509; Ex parte Moore, 115 U.S.P.Q. 145 (1957); Dunn v. Ragin v. Carlile, 50 U.S.P.Q. 472 (1941).
 
 C. Yoder's Plant Patents Validity
 
 172
 During the trial, Cal-Florida offered as evidence certain documents showing that growers had found mutations on the Mandalay variety that were the same as the patented variety Glowing Mandalay i. e. evidence that the sport Glowing Mandalay had recurred. Although Glowing Mandalay is no longer in the case, Cal-Florida later proffered similar evidence with respect to Gold Marble, Promenade, and Red Torch, which are three of the patents whose validity is challenged on appeal. Gold Marble, Promenade, and Red Torch are all sport patents, meaning that they first appeared as a sport of another plant, in contrast to seedling patents, which develop from seeds. Of the remaining four challenged patents, two were sport patents and two were seedling patents. Cal-Florida never proffered any sport recurrence evidence as to the other two sport patents, Mountain Sun and Southern Gold, nor did it offer any specific evidence attacking the seedling patents, Morocco and Mountain Snow. Since we find that the district court's ruling on the sport recurrence evidence did not preclude Cal-Florida from introducing other types of evidence to attack the validity of the patents, and since no sport recurrence evidence was introduced as to Mountain Sun and Southern Gold, we find no warrant on appeal to disturb the ruling that Mountain Sun, Southern Gold, Morocco, and Mountain Snow were valid and infringed. Plant patents, like others, enjoy a statutory presumption of validity that was not rebutted as to those four. See 35 U.S.C. § 282; Kim Bros. v. Hagler, 9 Cir. 1960, 276 F.2d 259, 263.
 
 
 173
 At the time the court rejected the sport return evidence for Glowing Mandalay, it made a ruling designed to apply to the rest of the trial with respect to that kind of evidence. That ruling is the focus of Cal-Florida's cross appeal on the plant patent validity point. Because of its importance, we set out the pertinent parts in some detail here:
 
 
 174
 (I)t seems clear that it was the Congressional intent that a person who discovered an asexually reproduced variety of a new and distinct plant was entitled to a patent.It was not contemplated, apparently, that he invent, in the term that is used, or in the significance of that term, as we understand it, traditional concept of inventing a machine . . .
 
 
 175
 In any event, the issue presented here is a rather narrow one and it has some practical overtones.
 
 
 176
 I am frank to confess that I think Mr. Foster's (Yoder's counsel) presentation here . . . is very persuasive. In all probability, this will be, or may be, the ultimate result of this trial. It may not be, after we have listened to the testimony, of course, of Mr. Boone's (Cal-Florida's counsel) other witnesses who are coming in to testify on the genetics of this thing, but on this one narrow limited issue, it would seem that the plaintiffs (Yoder) were entitled to prevail.
 
 
 177
 Therefore, the objection to the introduction of the various letters and documents from . . . the growers and plant propagators around the country, which were forwarded to Yoder Brothers over the years, is sustained.
 
 
 178
 Cal-Florida construes the above-quoted ruling as an all-encompassing holding that the constitutional standard of invention does not apply to plant patents. It further claims that since the ruling was admittedly intended to apply to the entire trial, it was precluded from offering evidence on the issues of newness, distinctness, and obviousness by the court's action. In fact, it never even tried to introduce the expected expert genetics testimony, although it did make a formal offer of more sport return evidence at a later time in the trial.
 
 
 179
 Yoder disputes the breadth of the ruling and its effect on any other evidence Cal-Florida might have offered, and notes that the court's actual ruling on the issues of newness and distinctness did not come until some two weeks later. With regard to the ruling on the admissibility of the evidence, Yoder argues that the documents would not have shown lack of distinctness, since the fact that a sport with particular traits recurs says nothing about what those traits are and how they differ from other plants. Furthermore, Yoder argues that the documents would not have shown obviousness, because if sport recurrence were evidence of obviousness, then almost no mutations would be patentable, and that would be contrary to Congress' intent.[38]
 
 
 180
 We do not construe the district court's evidentiary ruling as anything more than that; in our opinion, it simply held that the sport recurrence evidence was not relevant to any of the patent validity issues. We therefore confine our remarks accordingly.
 
 
 181
 The only possible probative value of the sport recurrence evidence would be to show that a sport of that particular size, shape, color, or other trait is predictable from a given variety of parent plant. Thus, we must first determine whether Congress intended predictability to negate the possibility of "invention." Next, if Congress considered that factor irrelevant, we must decide if the Constitution is offended by permitting patents on the kinds of sports that recur.[39]
 
 
 182
 Both the language of the statute and its legislative history persuade us that Congress did not intend to exclude the kind of mutation that might recur from the Act's protection. Instead, both Senate Report 315, 71st Cong., 2d Sess. (1930), on the original bill, and Senate Report 1937, 83d Cong., 2d Sess. (1954), on the 1954 amendment, speak generally about sports and mutations. The 1954 amendment was added to clarify Congress' intention that seedlings should be patentable, but in the process of describing the bill, the report states:
 
 
 183
 The enactment of this legislation will remove any doubt that the legislative intent of the Congress clearly means that sports, mutants, hybrids, and seedlings, discovered by persons engaged in agriculture or horticulture, should be patentable . . .
 
 
 184
 S.Rep. 1937, supra.
 
 
 185
 Although we are willing to assume for purposes of this argument that some mutations may appear that would have been genetically impossible before i. e. that a fundamental change in the biochemical structure of the chromosome may take place by far the majority of mutations and sports of chrysanthemums are predictable to some extent for those skilled in the field. For example, the testimony at trial indicated that a yellow sport could be expected from a white chrysanthemum. Indeed, part of the skill required of a chrysanthemum breeder is to know what to look for and to take steps immediately to preserve it by asexual reproduction if the desired trait appears. Given that fact, we think that the purpose of the Plant Patent Act would be frustrated by a requirement that only those rare, never-before-seen, if not genetically impossible sports or mutations would be patentable. That purpose was "to afford agriculture, so far as practicable, the same opportunity to participate in the benefits of the patent system as has been given industry, and thus assist in placing agriculture on a basis of economic equality with industry." S.Rep. 315, supra. To make it significantly more difficult to obtain a plant patent than another type of patent would frustrate that purpose.
 
 
 186
 We therefore find that Congress did not intend to exclude the kind of sport that recurs frequently from the Plant Patent Act. That being the case, the district court correctly ruled that the evidence proffered by Cal-Florida was irrelevant, as a matter of statutory law.
 
 
 187
 The only way that the Constitution would be offended by permitting patents on recurring sports would be if such leniency indicated that no "invention" was present.[40] We do not think that sport recurrence would negate invention, however. An infinite number of a certain sized sport could appear on a plant, but until someone recognized its uniqueness and difference and found that the traits could be preserved by asexual reproduction in commercial quantities, no patentable plant would exist. An objective judgment of the value of the sport's new and different characteristics i. e. nutritive value, ornamental value, hardiness, longevity, etc. would not depend in any way on whether a similar sport had appeared in the past, or whether that particular sport was predictable. We therefore find no reason to disturb our approval of the district court's evidentiary ruling based on the constitutional standard of invention. As that standard applies to plant patents, the proffered evidence was irrelevant.
 
 
 188
 Viewing the evidence offered on the patent validity question as a whole, we find that Cal-Florida failed to rebut the statutory presumption of validity as to Gold Marble, Promenade, and Red Torch, as well as the other four discussed above. Thus, the lower court's finding of validity must be affirmed on this record.
 
 D. Patent Infringement
 
 189
 On cross appeal, Cal-Florida asserts that the absence of flowering plants grown from the cuttings it had admittedly taken from Yoder's patented plants was fatal to Yoder's infringement counts. This is because the patent claim in each instance describes a mature flowering plant, and it is Cal-Florida's position that only another mature flowering plant could directly infringe. Yoder retorts that the Plant Patent Act provides that
 
 
 190
 (i)n the case of a plant patent the grant shall be of the right to exclude others from asexually reproducing the plant or selling or using the plant so reproduced.
 
 
 191
 35 U.S.C. § 163. The district court ruled that the act of asexual reproduction was complete at the time the cutting was taken. Finally, the pretrial stipulations established that Cal-Florida had taken plant material, or cuttings, from Yoder's patented plants.
 
 
 192
 We agree with Yoder that it was not necessary to prove that the cuttings actually matured into flowered plants to show infringement. Under such a rule, it would be virtually impossible for a propagator-distributor directly to infringe a patent, despite the vital role he plays in dissemination of plant material. Furthermore, we think section 163 is plain in its statement that a patentee may exclude others from asexually reproducing, selling or using the plant. The negative inference to be drawn from this is that commission of one of those acts would constitute infringement. We therefore affirm the finding of infringement.
 
 E. Treble Damages for Infringement
 
 193
 Section 284 of Title 35, U.S.Code, provides that the court shall award damages to the claimant upon a finding for him, and further provides that
 
 
 194
 (w)hen the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.
 
 
 195
 Although a trial court has considerable discretion in assessing damages under this section, Maloney-Crawford Tank Corp. v. Sauder Tank Co., 10 Cir. 1975, 511 F.2d 10, 13, an appellate court can reverse the trebling of damages if an abuse of discretion is shown. White v. Mar-Bel, Inc., 5 Cir. 1975, 509 F.2d 287; Dixie Cup Co. v. Paper Container Mfg. Co., 7 Cir. 1948, 169 F.2d 645. Where the issue of patentability is close and litigated in good faith, the court should be more reluctant to impose punitive damages. See Wahl v. Carrier Mfg. Co., 7 Cir. 1975, 511 F.2d 209; Enterprise Mfg. Co. v. Shakespeare Co., 6 Cir. 1944, 141 F.2d 916. In this case, the jury was instructed that the seven patents now on appeal were valid and infringed. In response to a special interrogatory inquiring about the amount of damages for each patent found valid and infringed by either the court or the jury, the jury entered figures as to those seven, and in addition, as to Deep Conquest. It then found that the infringement was willful as to the seven valid and infringed patents. It left blank, however, the space wherein it was to indicate by what factor the damage figure should be multiplied. The district court then trebled the damage amounts found by the jury, from which action Cal-Florida appeals.
 
 
 196
 Cal-Florida's principal effort to avoid the district court's trebling of the damages rests on a recital of its conduct and on protestations of its good faith both before and after suit was filed. It correctly points out that this case presented difficult issues of first impression on the Plant Patent Act and that it therefore had a good faith belief that the patents were invalid. The parties had extensive negotiations concerning the patents prior to the filing of the suit. Finally, Cal-Florida asserts that it did discontinue handling patented varieties after suit was filed.
 
 
 197
 In light of the above factors, we believe the district court abused its discretion in trebling the damages here. The primary reason that impels us to reverse on this point is the novelty of the issues presented. Cal-Florida has argued its case against the validity of these patents forcefully, and it is no small task to decide how to fit plants into the niches normally used by mechanical, design, or process inventions. The jury's finding that the infringement was willful was advisory only. See White v. Mar-Bel, Inc., supra, 509 F.2d at 292. Although we have affirmed the district court's findings of validity and infringement, we direct that only actual damages should be awarded to Yoder, the successful claimant.
 
 
 198
 The subleties of the chrysanthemum business have given rise to a welter of legal issues in this case, both patent and antitrust. To summarize our holdings on the patent claims briefly, we have agreed with the lower court that evidence of sport recurrence is irrelevant to the patentability of plants, and that insufficient evidence was introduced to rebut the statutory presumption of patent validity. We have thus affirmed the court's holding that the seven plant patents were valid and infringed. Finally, we have held that the novelty and difficulty of the plant patent issues in this case rendered the lower court's trebling of the jury's award an abuse of discretion.
 
 V. CONCLUSION
 
 199
 In light of our ruling on the price differential theory of damages, we reverse and remand the antitrust claims for retrial of damages. We affirm the district court's ruling of patent validity and infringement; and finally, we direct that the patent damage award be reduced to actual damages.
 
 
 200
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 201
 JOHN R. BROWN, Chief Judge, dissenting in part and concurring in part:
 
 
 202
 I concur in all of Judge Goldberg's excellent opinion and the result except those portions headed Monopolization and Attempted Monopolization.[41]
 
 
 203
 I think the issues of monopoly or attempted monopoly called for a jury determination. The holding on no monopoly as a matter of law rests[42] on the determination that the relevant market was ornamental plants generally, not just chrysanthemums in their infinite varieties.
 
 
 204
 Because Judge Goldberg has with infinite patience and objectivity discussed fully the factual and legal pros and cons I need not detail them here.
 
 
 205
 It is enough for me to base this on my impressions. As I faced in preparation for the oral arguments of a case all feared would produce an opus of the kind it did the complex briefs of these skilled advocates, I thought that the whole thing turned on chrysanthemums. That is all we talked about and heard on oral arguments.[43] This was big business the business of the breeding, developing, propagating and everexpanding distribution and sales of chrysanthemums or cuttings which would produce chrysanthemums for a like cycle of production, distribution and sales of chrysanthemums.[44]
 
 
 206
 Equally significant, what we hold unanimously as to § 1 of the Sherman Act is that CFPC and CFPCF were hurt, not in whatever business they might have had in general ornamental plants, but in the business of chrysanthemums. The pricing, distribution and exclusionary practices condemned related to chrysanthemums, because the record shows (see my note 45, supra ) that no matter how much sale of particular flowers may vary from time to time because of relative availability, price and demand, chrysanthemums are a large and significant factor in the total ornamental plant trade. The "relevant market" then even on the Court's analysis is not just ornamental flowers generally, but ornamental flowers including, as a significant element, chrysanthemums.
 
 
 207
 The power to exclude CFPC-CFPCF from chrysanthemums implies the possibility of exclusion of others to the point even of ultimate actual monopoly. And what has happened in this process? It is that one having an overwhelming position in an essential product has forced a competitor or potential competitors to abandon a significant legitimate phase of its general business so that no longer can it offer to the trade popular items without which service and market acceptability is incomplete. And all of this is accomplished, not because the predator has a dominant position in all plants, but because it has dominance[45] as to an indispensable element.
 
 
 208
 In more traditional language this cryptic analysis bears fruit or more accurately flowers. When the practical result of the BGA is realized, it becomes apparent that the relevant market is the chyrsanthemum market. The agreements effectively gave Yoder control over existing new and future, as yet nonexistent, new chrysanthemum varieties. This was accomplished in a manner which affected two groups, not just boycott victims. To receive the newer varieties, the boycott victims were required to agree to the BGA terms. Likewise, those who had already agreed to these terms had to continue to adhere to them or risk becoming a boycott victim. Thus, receipt by anyone of the BGA covered never varieties depended on acceptance of or continued following of the BGA.
 
 
 209
 Since BGA was composed only of breeders, since a breeder member's voting strength was proportional to the expenses which that member bore, and since the expenses borne were determined in proportion to the amount of royalties collected on the breeder's new varieties, Yoder controlled BGA. The record indicates that Yoder's share of chrysanthemum cuttings varied from 61.4% in 1969 to 58.1% in 1972. Furthermore, although not legally significant with respect to relief, the fact that in the pre-statute of limitations period Yoder had almost 100% of the newer varieties of chrysanthemums registered with BGA has great historical significance.
 
 
 210
 Control of the BGA is tantamount to control of the sale of any chrysanthemum cutting registered with BGA. In economic terms, Yoder controlled the market supply of BGA chrysanthemum cuttings. Indeed, the structure of BGA for voting purposes was such that Yoder could control this cutting supply without necessarily retaining ownership of a majority of BGA chrysanthemum varieties. Not satisfied with this control, Yoder supplemented the BGA with the GRA program (with similar restrictions to the BGA) which was designed to extend its control over non-BGA covered new chrysanthemum varieties. The intended effect was expansion of Yoder's control over the total market supply of chrysanthemum cuttings. The success of this combined BGA-GRA program is partly demonstrated by the increasing percentage of CFPC's and CFPCF's sales which Yoder controlled varieties claimed: 1963, 0.19%; 1969, 17.59%; 1971, 41.22%.
 
 
 211
 In light of Yoder's control of BGA, the increased percentage of Yoder controlled varieties in CFPC and CFPCF sales, and the indicated responsiveness of grower demand for cuttings to changes in ultimate consumer demand, any refusal by CFPC and CPFCF to abide by the terms of the respective agreements would have made them unable to service growers, partly or perhaps totally, when the consumer demand switched from other flowers in the ornamental flower bouquet to chrysanthemums.
 
 
 212
 Anytime discussion of the relevant market arises, basic economic tools are used. Often use of these tools tends to make one forget the explicit underlying assumptions on which these analytical devices are based. Explicit in all supply and demand analysis is time. Similarly, relevant market determinations necessarily entail supply and demand considerations. Thus, time is a mandatory consideration when the relevant market is being determined. Over a time span, the responsiveness of grower demand for different flowers to shifting consumer demand does not, a fortiori, indicate that the ornamental flower market per se is composed of " . . . commodities reasonably interchangeable by consumers for the same purpose . . . " at a given time. If the bundle of flowers described as the ornamental flower market is perceived as a changing composition of certain flowers over a time span, at any given moment that market is one for a specific flower or for specific flowers. Thus, the time frame under consideration is a variable which must be controlled when the relevant flower market is being determined.[46]
 
 
 213
 Consequently, when a supplier cannot sell growers a specific flower demanded at a set time, he is effectively excluded from the ornamental flower market at that time. Alternatively, when the demand for a specific combination of flowers includes chrysanthemums, one who cannot supply all parts of that singular bundle is excluded from the market for that bundle of flowers at that time.
 
 
 214
 At any given moment when CFPC-CFPCF was faced with grower demand for chrysanthemum cuttings or a flower cutting bundle which included significant amounts of chrysanthemum cuttings, the relevant market was chrysanthemum cuttings: either chrysanthemum cuttings were synonymous to the ornamental flower market or monopolization of the chrysanthemum market carried with it the power to control the ornamental market analogous to the Standard Oil Co. v. United States, 1911, 221 U.S. 1, 77, 31 S.Ct. 502, 55 L.Ed. 619, and United States v. Aluminum Company of America, 2 Cir., 1945, 148 F.2d 416, 424, rationale. As any propagator-distributor who desired to supply growers with the flower cuttings they required at that instant, any failure to adhere to the BGA system by CFPC-CFPCF risked the inability to meet demand at that instant when Yoder controlled varieties were requested. In simpler terms, at specific times through the BGA and GRA arrangement Yoder possessed the power to exclude CFPC and CFPCF from the ornamental flower market by monopolization of the chrysanthemum market.[47]
 
 
 215
 A stronger plant will not immediately take over an entire garden. However, failure to control its relentless growth into various portions secures its eventual elimination of weaker varieties. So too in the ornamental flower-chrysanthemum market.
 
 
 216
 Operating on what I hope is not a dubious notion that a Judge should have at least the common sense although not encased in Seventh Amendment armor of a jury I cannot escape the conviction that these competing factors called for fact-finder resolution, not a deliverance of law from our non-horticulture hothouse. When one wants a Yellow Rose of Texas he is not satisfied with a Mrs. Miniver, no matter how cheap, available or beautiful in some other beholder's eye. A camellia for a hair dress offset to olive skin and a black gown is not filled by a carnation, or for that matter, a chrysanthemum.
 
 
 217
 To each his own. And here David and Goliath are struggling over a single thing chrysanthemums. Survival of one in this business depends on whether the other can be curbed.
 
 
 218
 I respectfully dissent as to this feature of the Court's holding.[48]
 
 
 
 [1]
 The evidence indicated that the BGA program's operation insofar as royalty collection was concerned did not operate any differently when the propagator-distributor was Yoder
 
 
 [2]
 In some ways, the GRA program provided a service to growers. Normally, a grower would not have the facilities to test a mutation or sport that he found on a chrysanthemum plant to see if, indeed, a new variety that could be asexually reproduced had been discovered. By taking advantage of Yoder's extensive facilities for this work, both parties benefited Yoder had another new variety on which it was receiving royalties, and the grower had the benefit of half the royalties paid for his acuteness of observation in finding the new variety. Persons who wished to have access to the Yoder service, however, had to sign GRA agreements, which contained restrictions on use of varieties accepted by Yoder similar to those in the BGA agreement
 
 
 [3]
 Yoder's unfair competition claims and Cal-Florida's price discrimination and trade disparagement claims were withdrawn during the trial
 
 
 [4]
 The court's judgment of August 29, 1974, orders that Yoder recover $42,712.44 from CFPC for infringement of the plant patents Deep Conquest, Morocco, Mountain Snow, Mountain Sun, Promenade, Red Torch, and Southern Gold. The remaining $24,205.20 was to come from CFPCF for infringement of the latter six plant patents plus Gold Marble
 
 
 [5]
 One major failing of both proposed tests is the confusion of the standing inquiry with the substantive issues of causation and fact of damage. Cf. Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv.L.Rev. 1127, 1133-34 & n. 36 (1976) (comparing analyses under standing and damage doctrines)
 
 
 [6]
 We do not believe that ultimate proof of injury in fact is a necessary requirement for standing. See 481 F.2d at 129 n. 11. Cal-Florida's allegations are sufficient to establish injury in fact, to the extent that such a prerequisite exists for antitrust standing
 
 
 [7]
 Yoder does not allege that Cal-Florida's claimed injuries were not to its business or property as required by section 4. Cf. Hawaii v. Standard Oil Co., 1972, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184
 
 
 [8]
 Because we have found standing under the stricter requirements of section 4 (treble damages), we necessarily have decided that standing could have been sustained under the more lenient criteria of section 16, 15 U.S.C. § 26 (injunctive relief). See Tugboat, Inc. v. Mobile Towing Co., supra, 534 F.2d at 1174, 1178 n. 12
 
 
 [9]
 The 1974 Amendment to the Clayton Act recodified Section 5(b) at 15 U.S.C. § 16(i). Pub.L. 93-528, 88 Stat. 1706. Formerly, § 5(b) appeared at 15 U.S.C. § 16(b). The amendment to the statute added procedures whereby the Attorney General would take into account the public interest before approving a consent decree, but it made no change in the tolling provision of the statute of limitations
 
 
 [10]
 The fact that Cal-Florida sought to intervene in the consent decree proceedings is irrelevant for our purposes. We assume for the purposes of this discussion that Cal-Florida, whose motion to intervene in the consent proceedings was denied on the same day as the consent decree was entered, would have been able to take advantage of the full sixty day period available to a party to the decree. We note, however, that its standing to challenge the provisions of the decree on appeal would have been questionable. See Utility Contractors Ass'n of New Jersey, Inc. v. Toops, 3 Cir. 1974, 507 F.2d 83. In fact, neither CFPC nor CFPCF attempted to appeal either from the denial of intervention or from the provisions of the consent decree itself
 
 
 [11]
 The court noted that Federal Rule of Criminal Procedure 32(a) prescribes the formalities to be followed in the imposition of sentence. Rule 32(b)(1) sets out the procedures to be utilized in the entry of a final enforcible judgment of conviction. The court also observed that Federal Rule of Criminal Procedure 55 refers to the date that judgment is entered as one of the records that must be kept by the clerk
 
 
 [12]
 We do not reach the precise question that was before the Russ Togs court, since we believe the two cases to be distinguishable. Nevertheless, we do note that the policies underlying the finality of judgments seem to run in a direction contrary to that court's result. We express no opinion on the ultimate resolution of the competing considerations of finality of judgments and liberal access to Government proceedings for private litigants; we simply stress that we are not faced with that case
 
 
 [13]
 Category one involved a horizontal combination among traders at one level of distribution designed to exclude direct competitors from the market. 467 F.2d at 186. Category two was somewhat broader, involving vertical combinations among traders designed to exclude from the market direct competitors of some members of the combination. Id
 
 
 [14]
 Yoder's argument that the true purpose of BGA was to foster the creation of new varieties of ornamental plants is analogous to FOGA's argument that its mission was to help the original fashion designers and to protect the industry from style pirates. Neither justification is relevant if the exclusionary or coercive elements in the program are so central that it could not exist without them
 
 
 [15]
 The fact that BGA varieties could be obtained outside the program by methods such as purchasing mother stock at a retail florist does not save the program. The record contains ample evidence of Yoder's efforts to stop such practices. Its use of friendly persuasion instead of a club does not lessen the coercive aspects of the program itself
 
 
 [16]
 We reject Yoder's suggested analogy to trade secret law, claiming that the plant's genetic code is the secret. In one sense, the genetic code always remains a secret, even to the breeder. In the more common sense, however, as soon as the plant is released, so are its secrets. We prefer the latter view as the one more in accordance with experience
 
 
 [17]
 That the geographic market was nationwide was not disputed
 
 
 [18]
 Section 2 provides in pertinent part:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce . . . (shall be guilty of an offense).
 15 U.S.C. § 2.
 
 
 [19]
 We agree with Cal-Florida that the district court would have been mistaken to apply a rigid rule requiring 50% of the market for a monopolization offense without regard to any other factors. See Cliff Food Stores, Inc. v. Kroger, Inc., supra. If the court's directed verdict was correct on another ground, however, his reasons for so ruling would be immaterial. We have therefore structured our own discussion according to the issue we perceive: was the market all ornamental plants or could it have been chrysanthemums only?
 
 
 [20]
 This alternative appears to come closest to the issue stated in the pretrial stipulation, which specified commerce in the propagation and sale of chrysanthemum cuttings. For the purposes of this discussion, however, we are willing to consider either chrysanthemums grown or cuttings taken and sold
 
 
 [21]
 We note that this theory looks to the horizontal competition between Cal-Florida and Yoder in their capacities as propagator-distributors
 
 
 [22]
 Cal-Florida's computation went as follows:
 Thus, the only thing that has been compared by these exhibits is the sales income of the two companies.
 
 
 [23]
 Jack Neckar of Cal-Florida also testified that the BGA royalty was a constraint on pricing to the grower, apparently referring to the danger that growers might turn to self-propagation. Yoder, however, faced the same limitation to the same degree in its capacity as a propagator-distributor. It is therefore difficult to see how the presence of self-propagators injured competitive relations between Yoder and Cal-Florida
 
 
 [24]
 The standard of proof needed to establish fact of damage is significantly different than that for amount of damage. The Supreme Court first described the difference between the two elements in Story Parchment Co. v. Paterson Paper Co., 1931, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548:
 It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.
 From this, the courts have inferred that a stricter standard of proof is necessary for fact of damage than for amount of damage. See Greene v. General Foods Corp., 5 Cir. 1975, 517 F.2d 635, 660, cert. denied, 1976, --- U.S. ----, 96 S.Ct. 1409, 47 L.Ed.2d 348; Copper Liquor, Inc. v. Adolph Coors Co., 5 Cir. 1975, 506 F.2d 934, 953, reh. denied, 509 F.2d 758; Terrell v. Household Goods Carriers' Bureau, 5 Cir., 494 F.2d 16, 20, cert. dism'd, 1974, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260. See generally Areeda, supra note 5, Reasoner and Carter, Antitrust Developments in the Fifth Circuit October 1974 Term, 29 Southwestern L.J. 801, 817-23 (1975). Since our inquiry is directed to fact of damage and causation elements rather than to amount, we are governed by the higher standard of proof.
 
 
 [25]
 Ascertaining what constitutes "substantial evidence" can be difficult. For amount of damages, the standard is probably satisfied by reasonable estimates and indirect proof. See Story Parchment Co. v. Paterson Parchment Paper Co., supra, Terrell v. Household Goods Carriers' Bureau, supra. In contrast, for fact of damage and causation, we infer from Story Parchment and Bigelow, supra, that "substantial evidence" would be less speculative and uncertain
 A number of recent decisions in this Circuit have addressed this problem. In Shumate & Co. v. National Ass'n of Securities Dealers, Inc., supra, this Court held that Shumate's own testimony regarding his damages, unsupported by any relevant data, was insufficient to create a jury question on fact of injury. In Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc., supra, conclusory testimony and generalized allegations from plaintiffs' corporate officers and one of plaintiffs' competitors to the effect that defendant's practices caused losses to plaintiffs, supported by citation of only one loss of business on a specific contract and only one vague opinion that the defendants' price discounting practice made it more difficult to compete, were insufficient to go to the jury. Finally, neither fact of injury nor causation was proved adequately in Kestenbaum v. Falstaff Brewing Corp., 5 Cir. 1975, 514 F.2d 690, cert. denied, 1976, --- U.S. ----, 96 S.Ct. 1412, 47 L.Ed.2d 349, and M. C. Mfg. Co. v. Texas Foundries, Inc., 5 Cir. 1975, 517 F.2d 1059, cert. denied, 1976, --- U.S. ----, 96 S.Ct. 1466, 47 L.Ed.2d 736.
 With regard to the kind of evidence that would be material, the M. C. Mfg. court, in rejecting plaintiff's contention that it too should have enjoyed a predatorily low price for a component part, offered several comments relevant to the case before us:
 The avowed purpose of the Sherman Act is the preservation of the open, competitive market. . . . (D)amages are recoverable only upon a showing that absent the anticompetitive practice plaintiff would not have suffered the loss.
 517 F.2d at 1064. Antitrust plaintiffs are not entitled to the utter elimination of competition or competitors. Thus, they cannot prove fact of injury by pointing only to the effects of normal competition. Rather, they must prove that the actions in violation of the antitrust laws were a material factor in causing the injuries complained of. See generally Areeda, supra note 5.
 
 
 [26]
 Yoder also advances a variety of complaints concerning the instructions on passing on actually given to the jury which we do not reach
 
 
 [27]
 Some courts had held that the remote purchaser would not have standing unless he could prove that the overcharge was passed on to him under something analogous to a cost plus contract, turning Hanover Shoe on its head. E. g. Albertson's, Inc. v. Amalgamated Sugar Co., D.Utah 1973, 62 F.R.D. 43, modified on other grounds, 503 F.2d 459; Philadelphia Housing Auth. v. American Radiator & Std. Sanitary Corp., E.D.Pa.1970, 50 F.R.D. 13, aff'd sub nom. Mangano v. American Radiator & Std. Sanitary Corp., 438 F.2d 1187. Fortunately for the jurisprudence, the Liquid Asphalt court recognized that the policies underlying Hanover Shoe required a different approach if the question was plaintiff's access to a forum instead of defeating a treble damage award. See Comment, Standing to Sue in Antitrust Cases: The Offensive Use of Passing-On, 123 U.Pa.L.Rev. 976 (1975)
 
 
 [28]
 A few observations here are in order. We have been careful to describe the overcharge as one affecting Cal-Florida's sales price to its customers, rather than as a cost in Cal-Florida's business in the same sense as fertilizer was a cost. The fact that the alleged overcharge was denominated a royalty is not enough to negate the possibility of overcharge
 
 
 [29]
 Even if the comparative price data had not been fatally defective, we note that the amount of the jury's verdict might have required a remand in any event. Cal-Florida suggests that the jury arrived at its figure by taking the total royalties paid by both companies, rounding that amount up to $258,000, deciding that damages were one-half that amount, and giving each company $64,000 prior to the court's trebling. Several problems exist with this explanation: for example, no evidence of a "reasonable" royalty amount was introduced, thus casting doubt on the jury's license to split the royalties in half; and Cal-Florida of Florida paid only $42,306.47 in royalties, which leaves $22,193.53 of its award unaccounted for unless the two companies are treated as one
 
 
 [30]
 An eighth plant patent, Deep Conquest, was found valid and infringed by the jury. Cal-Florida's only point regarding that patent goes to the court's trebling of the damages for infringement. See Part IV. E., infra
 
 
 [31]
 The U.S. Plant Patent numbers for those varieties were as follows: Red Torch, U.S. Plant Patent 3,263; Gold Marble, U.S. Plant Patent 3,220; Morocco, U.S. Plant Patent 3,191; Promenade, U.S. Plant Patent 3,221; Southern Gold, U.S. Plant Patent 3,257; Mountain Snow, U.S. Plant Patent 3,215; Mountain Sun, U.S. Plant Patent 3,250
 
 
 [32]
 The only express provision modifying the applicability of the invention patent statutes for plant patents is contained in 35 U.S.C. § 162, which says that no plant patent will be invalidated for noncompliance with § 112 (description) if the description is as complete as is reasonably possible. No description issue is before us
 
 
 [33]
 These factors are taken from 35 U.S.C. § 101 ("any new and useful process, machine, manufacture, or composition of matter, or . . . improvement thereof") and 35 U.S.C. § 103 ("the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would (not) have been obvious")
 
 
 [34]
 In order for a plant to have "existed" before in nature, we think that it must have been capable of reproducing itself. Thus, we have concluded that the mere fact that a sport of a plant had appeared in the past would not be sufficient to preclude the patentability of the plant on novelty grounds, since each sport is a one-time phenomenon absent human intervention. See in this connection the discussion on validity, at IV.C., infra
 
 
 [35]
 We suspect that part of our problem in applying patent concepts to the facts before us lies in the fact that we are dealing with ornamental plants. Beauty for its own sake is not often a goal of inventors indeed, even ornamental plant breeders might be more aptly described as seekers of beauty for profit. Nevertheless, the statute does not exempt ornamental plants, and so we are bound to treat them on a par with more "useful" botanical creations
 
 
 [36]
 Lest the reader fear that Congress neglected to make adequate provision for reproduction of the sexual type, we hasten to note that the Plant Variety Protection statute, 7 U.S.C. §§ 2321-2583, applies only to sexually reproducing plants
 
 
 [37]
 Whether he might also be entitled to a patent on his plant is more problematic, although we would not want to rule out the possibility
 
 
 [38]
 Yoder also argues that the pretrial stipulation did not include obviousness as an issue to be tried, and that we should ignore it for that reason. We prefer not to take that approach: while "invention" or obviousness was not explicitly listed as an issue, it was implicit in several issues. Furthermore, it was discussed thoroughly by the district court and counsel for both parties
 
 
 [39]
 In this discussion, we are concerned only with the "invention" or obviousness issue. As we have defined novelty, supra, the recurrence of a sport of a particular color would be irrelevant. Similarly, sport recurrence says nothing about the new plant's particular characteristics. The testimony at the trial amply established that Yoder's patented chrysanthemums were distinct to those skilled in the field i. e. those in the breeding business. We note that there is a distinction between looking to the opinion of persons in the industry to prove a feature of patentability and relying on commercial success to prove nonobviousness. Yoder's arguments relied on the former kind of evidence
 
 
 [40]
 We do not regard this argument as one attacking the constitutionality of the Plant Patent Act; rather, it simply inquires how broadly the Act can be read consistent with the Constitution
 
 
 [41]
 For ease of reference, the footnotes in the dissent follow consecutively those of the Court
 
 
 [42]
 I fully approve the Court's construction of our opinion in Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir., 1969, 417 F.2d 203, which in language looser than needed, discussed this in terms of 50% plus. That would be bad law, but worse bad economics. In non-s 2 Sherman Act but highly analogous antitrust situations, 14% and 34-36% of the relevant markets have been sufficient for anti-competitive purposes. United States v. Philadelphia National Bank, et al., 1963, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915; compare United States v. First City National Bank of Houston, 1967, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151, with United States v. Provident National Bank, E.D.Pa., 1968, 280 F.Supp. 1
 
 
 [43]
 I acknowledge, of course, that CFPC and CFPCF did, soto voce, urge the ornamental flower relevant market theory
 
 
 [44]
 The Court recognizes this (see p. ---):
 
 
 [45]
 The Court points out that Yoder's share of chrysanthemum cuttings went from 61.4% in 1969 to 58.1% in 1972 (see note 20, supra and appended text)
 
 
 [46]
 C. Ferguson, Microeconomic Theory, at 28, 113-15 (Rev. ed. 1969)
 
 
 [47]
 See generally R. Posner, An Economic Analysis of Law, at 124-27 (1974); see also R. Posner, Antitrust Cases, Economic Notes and Other Materials, at 612-18 (1974)
 
 
 [48]
 I can't resist the temptation to express a regret that having gone all the way through an extended evidentiary jury trial the Trial Court did not submit this issue to the jury under appropriate general instructions and a special verdict. F.R.Civ.P. 49(a). Jamison Co., Inc. v. Westvaco, Corp., 5 Cir., 1976, 526 F.2d 922, reh. denied, 530 F.2d 34. Then we could have disposed of the issue once and for all, without assuming I am right and the Court wrong a new trial on substantially the same evidence
 This comment goes also to the Trial Judge's failure to use, as he did with respect to some issues an alternative 49(a) special issue submission on the two "fact of damage" theories, one of which we find to be faulty but which in the inscrutable mystery of a general verdict may have infected an otherwise sustainable dollar damage award. Now all agree that this must go back for a limited retrial wending its way between what we have said, what we have not said and what perhaps we meant to say.